# United States Court of Appeals
## For the First Circuit

Nos. 02-2078, 02-2079

CHUNGCHI CHE,

Plaintiff-Appellant, Cross-Appellee,

v.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, JAMES F. JOHNSON,
Individually and in his Official Capacity,

Defendants-Appellees, Cross-Appellants,

DONALD A. SMITH, JR., Individually and in his Official Capacity,
BRIAN P. DWYER, Individually and in his Official Capacity,

Defendants, Appellees.

CROSS-APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker,[*] Senior U.S. District Judge]

Before

Howard, Circuit Judge,

Bownes and R. Arnold,[**] Senior Circuit Judges.

---

[*]Of the Southern District of New York, sitting by designation.

[**]The Hon. Richard S. Arnold, of the Eighth Circuit, sitting by designation.

Jonathan J. Margolis with whom Robert S. Mantell, Laurie A. Frankl and Rodgers Powers & Schwartz, LLP were on brief for plaintiff-appellant, cross-appellee.

Laurie F. Rubin with whom Thomas M. Elcock and Prince, Lobel, Glovsky & Tye LLP were on brief for defendants-appellees, cross-appellants.

————————————————

August 26, 2003

————————————————

**BOWNES, Senior Circuit Judge**. A jury found that Chungchi Che ("Che") was the victim of discrimination by his employer, the Massachusetts Bay Transportation Authority ("MBTA"), and one of his supervisors, James Johnson ("Johnson"). Che and the defendants appealed. The parties ask us to review a number of rulings the district court made before, during and after the trial. We affirm, or decline to reach, the district court's decisions on all these matters except one.

## I. BACKGROUND

Che is an American citizen of Asian descent. In 1982, Che was hired by the MBTA to drive buses. As the years passed, Che was promoted several times. In 1988, the MBTA sent Che to receive training in police work. As part of the training, Che was introduced to anti-discrimination laws. After this training, Che came to believe that in years past the MBTA discriminated against him based on his race and national origin. Che filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") and, eventually, a lawsuit in state court. Meanwhile, Che was promoted to the position of chief inspector, the highest unionized job at the MBTA. In his capacity as a chief inspector, Che was required to monitor the operation of the MBTA's Green Line.

In 1993, James Johnson was appointed as superintendent of the MBTA's Green Line. Johnson believed that greater discipline was needed amongst the MBTA employees he supervised. In 1994, Che

-3-

and another employee had an argument at work. Johnson demoted Che from chief inspector to streetcar operator, but this punishment was later changed by the MBTA's grievance procedure to a three day suspension. Shortly thereafter, Che suffered from an anxiety attack and fainted in the presence of his union representative. When the union representative asked Johnson to call for help, Johnson said, "I think the chink is faking it." This incident prompted Che to file a second MCAD complaint and state court lawsuit alleging employment discrimination. Soon after, Che's two lawsuits against the MBTA were consolidated.

Che alleges that his supervisors continued to discriminate against him throughout 1995. Che says he was improperly disciplined on a number of occasions. The main one involved a dispute between Che and Johnson that erupted in November, 1995. The incident began when Che called into work to say that he would be late because of traffic congestion. Che arrived to work at 4:45 p.m., but did not start his shift until 5:00 p.m. because the person who Che was scheduled to replace was still working on one of the trains. The MBTA employee responsible for keeping track of work schedules recorded in a special document called the "assignment block" that Che's shift began at 5:00 p.m. Che disagreed and wanted it recorded that he arrived at 4:45 p.m. The record keeper refused. Later that evening, Che made a notation

in the assignment block indicating that he had arrived at work at 4:45 p.m. and began his shift at 5:00 p.m.

Two days later, Johnson confronted Che about the incident. The assignment block was used for recording a variety of things, including hours worked for payroll purposes. The MBTA had problems on past occasions with employees writing in the assignment block in order to falsify time records. Johnson told Che that he was not permitted to make notations in the assignment block. Another MBTA supervisor involved in the conversation informed Johnson that in the past other MBTA employees had been allowed to write in the assignment block. Che told Johnson that it was important that chief inspectors be able to write in the assignment block in order to pass information to other employees. According to Che, Johnson said that he would think about the matter and get back to Che in a few days.

That same evening, Che noticed that leaves had piled up around some of the tracks on the Green Line. The MBTA uses heated coils to defrost tracks in the winter to allow for switches to operate properly. The heated coils sometimes ignite dried leaves and cause fires. Che's shift ended late at night and he was worried that the coils would be turned on the next morning and ignite the leaves. Che made a note in the assignment block stating "heaters cannot be turned on until the leaves have been cleaned

away. (cause fire)." Che signed his name and badge number next to the notation.

Upon learning that Che had written in the assignment block, Johnson accused Che of insubordination and launched an investigation into the incident. When the investigation was completed, Che was demoted from chief inspector to streetcar operator. Che became emotionally distraught and went on sick leave. Che was later diagnosed as suffering from stress and anxiety disorders, as well as an irritable bowel syndrome. He subsequently filed for workers compensation. Che has remained on sick leave ever since, but is still an MBTA employee.

As a result of the demotion, Che filed a third lawsuit, but this time in federal district court. Che alleged that he was demoted in retaliation for filing his previous MCAD complaints and his state court lawsuits, and that he was discriminated against based on his race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Che also brought discrimination claims under 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Mass. Gen. Laws. ch. 151B.

Before the trial began, the district court declined to exercise supplemental jurisdiction over Che's state law claims and dismissed them pursuant to 28 U.S.C. § 1367(c). During the trial, the district court made two decisions that are pertinent to this appeal. First, the district court ruled that there was no evidence

justifying submission of punitive damages to the jury. Second, the district court denied the defendants' request for a jury instruction on the law regarding constructive discharges.

The jury ultimately found that the MBTA and Johnson violated federal law by demoting Che in retaliation for filing his earlier lawsuits. The jury awarded Che $375,000 in back pay and $125,000 for emotional distress. The jury also found that Johnson created a retaliatory hostile work environment, but awarded Che no damages on this claim.

Following the jury's verdict, the parties filed several motions, only three of which are relevant to this appeal. First, the defendants properly moved for judgment as a matter of law, claiming that there was not enough evidence for a reasonable jury to find in Che's favor. Second, Che moved the district court for reinstatement to his job as chief inspector, or alternatively, for an award of front pay. Lastly, the defendants moved for a remittitur of Che's back pay award. The district court denied all of these motions.

On appeal, Che challenges the district court's dismissal of his state law claims, the dismissal of his claim for punitive damages, and the denial of his request for reinstatement or front pay. The defendants cross-appeal the district court's denial of their motion for judgment as a matter of law, refusal to instruct

the jury on the constructive discharge standard, and denial of their motion to remit the jury's award of back pay.

## II.  DISCUSSION

### A.  <u>Dismissal of the State Law Claims</u>

By statute, a district court may decline to exercise supplemental jurisdiction if, among other things, the state claim "substantially predominates over the claim or claims over which the district court has original jurisdiction," or "in exceptional circumstances, [when] there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c)(2), (c)(4).  Prior to trial, the district court invoked both of these statutory reasons for refusing to exercise supplemental jurisdiction over Che's state law claims.  The district court's reasoning rested primarily on the fact that when Che filed his current state law claims in federal court he had two discrimination lawsuits against the MBTA already pending in state court.

We afford district courts "broad discretion" when making decisions regarding supplemental jurisdiction.  <u>Vera-Lozano</u> v. <u>Int'l Broad.</u>, 50 F.3d 67, 70 (1st Cir. 1995).  In making these decisions, district courts must examine the totality of the circumstances.  <u>See</u> <u>Rodriguez</u> v. <u>Doral Mortg. Corp.</u>, 57 F.3d 1168, 1177 (1st Cir. 1995).  This includes giving consideration to such issues as "comity, judicial economy, convenience, fairness and the like."  <u>Roche</u> v. <u>John Hancock Mut. Life Ins. Co.</u>, 81 F.3d 249, 257

-8-

(1st Cir. 1996). All three of Che's lawsuits involved similar claims of discrimination against the same employer. The three cases shared some of the same witnesses and evidence. In light of these facts, we cannot say that the district court abused its discretion.

B. Motion for Judgment as a Matter of Law

We review de novo a district court's denial of a motion for judgment as a matter of law. See Primus v. Galgano, 329 F.3d 236, 241 (1st Cir. 2003). "Once a jury renders a verdict, a heavy burden is placed on one who challenges it." White v. N.H. Dep't of Corr., 221 F.3d 254, 259 (1st Cir. 2000) (citation and quotation marks omitted). This is because our standard of review requires that we examine the evidence in the light most favorable to Che and draw all reasonable inferences in his favor. See Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002). In addition, our review "is weighted toward preservation of the jury verdict, for we must affirm unless the evidence was so strongly and overwhelmingly inconsistent with the verdicts that no reasonable jury could have returned them." Crowley v. L.L. Bean, Inc., 303 F.3d 387, 393 (1st Cir. 2002) (citation and quotation marks omitted).

We begin by noting that Che has presented only circumstantial evidence of discriminatory retaliation. In such cases, we use the burden-shifting analysis first established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973).  See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 6 (1st Cir. 2000).  Under the McDonnell Douglas analysis, a plaintiff must make a prima facie showing of retaliation by presenting evidence that (1) he engaged in protected conduct, (2) he was thereafter subjected to an adverse employment action, and (3) a causal connection existed between the protected conduct and the adverse action.  See Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998).

The defendants challenge only the third element of Che's prima facie case, and we will therefore assume that he meets the first two.  The defendants argue that no reasonable jury could find a "causal connection" between Che's filing of his first two discrimination lawsuits against the MBTA and his demotion to streetcar operator because the demotion occurred eleven months after he filed his most recent lawsuit.  According to the defendants, "[t]his lack of temporal proximity dooms Che's prima facie case."  We disagree.

Temporal proximity is but one method of proving retaliation.  See Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994) (per curiam) (stating that "[o]ne way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action."); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (stating that "there are many sources of circumstantial evidence

-10-

that . . . can demonstrate retaliation"). Evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection. See Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir 1997) (stating that "where there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" that a causal connection exists); Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (stating that "[t]he causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct . . ."); 2 Arthur Larson & Lex K. Larson, Employment Discrimination § 35.02, at 35-15 (2d ed. 2001).

When examining such evidence, we keep in mind that the prima facie case is "a small showing that is not onerous and is easily made." Kosereis v. State of Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) (citations and internal quotation marks omitted). After carefully examining the record, we believe there is ample evidence of disparate and discriminatory treatment from which a jury could find a causal connection between Che's demotion and his

-11-

earlier lawsuits.  Perhaps most striking is the fact that there is documentary and testimonial evidence that, unlike Che, other employees were not disciplined for writing in the assignment block. Multiple witnesses testified that they wrote on the assignment block themselves, or saw other chief inspectors write on the assignment block, but were not disciplined.  There was testimony from which the jury could find that Johnson never issued any written or verbal orders telling other employees not to write on the assignment block.

There is other evidence as well.  In 1994 Johnson disciplined Che for having an argument with a coworker.  There was evidence at trial that Johnson did not discipline white inspectors who engaged in arguments with coworkers.  In addition, after Johnson disciplined Che for the argument, Che fainted and his union representative asked Johnson to call for help.  In response, Johnson said "I think the chink is faking it."  There was evidence at trial that Johnson and another MBTA supervisor referred to Che as a "chink" on other occasions.  In sum, this evidence of discriminatory and disparate treatment is sufficient to meet "the relatively low threshold showing necessary to establish a prima facie case."  Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 165-66 (1st Cir. 1998).

Once a prima facie case has been presented under the McDonnell Douglas analysis, an inference of discrimination arises.

-12-

See Hazel v. United States Postmaster Gen., 7 F.3d 1, 3 (1st Cir. 1993). The employer is then required to offer a non-discriminatory reason for the employment action in question. See Bishop v. Bell Atl. Corp., 299 F.3d 53, 58 (1st Cir. 2002). In this case, the defendants claim that Che was demoted because he was insubordinate for writing in the assignment block. When the employer offers a non-discriminatory reason, the inference of discrimination fades away. All that remains is for the plaintiff to show that the adverse employment action was the result of discriminatory animus. See Feliciano de la Cruz, 218 F.3d at 6. Evidence that the employer's stated reasons are pretextual can be sufficient for a jury to infer discriminatory animus. See Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002).

The defendants argue that there is no evidence from which a reasonable jury could have found that the MBTA's stated reason for demoting Che was pretextual. Pretext can be proven in several different ways. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000). One way is by presenting evidence of disparate treatment. See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 43-44 (1st Cir. 2001); Mesnick, 950 F.2d at 824. As we have already explained, there was documentary and testimonial evidence that other employees who wrote on the assignment block were not disciplined.

Another way of demonstrating pretext is "by showing that the employer's proffered explanation is unworthy of credence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (citation and quotation marks omitted). In this regard, there was testimony from which it could be inferred that Johnson withdrew his order not to write on the assignment block after he was informed that such behavior had been permitted in the past. Thus, the jury could have concluded that Che was not insubordinate to begin with and that the MBTA's stated reason for his demotion was contrived. See Rossy v. Roche Prods., Inc., 880 F.2d 621, 625 n.5 (1st Cir. 1989) (stating that "[t]he reasonableness of the employer's reasons may of course be probative of whether they are pretexts." (citation and quotation marks omitted)).

We are mindful that there is no "mechanical formula" for finding pretext. Feliciano de la Cruz, 218 F.3d at 6. It is the type of inquiry where "everything depends on the individual facts." Thomas v. Eastman Kodak Co., 183 F.3d 38, 57 (1st Cir. 1999) (citation and quotation marks omitted). As such, we have been "particularly cautious" about taking such questions out of the jury's hands. Hodgens, 144 F.3d at 167; see also Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 34 (1st Cir. 1990) ("This court has consistently held that determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury, as proof is generally based on inferences that

-14-

must be drawn, rather than on the proverbial 'smoking gun.'" (citation and quotation marks omitted)). In light of the evidence described above, we agree with the district court that there was sufficient evidence from which a jury could find that the MBTA's stated reason for Che's demotion was pretextual.

The defendants' motion for judgment as a matter of law also challenged the jury's finding that Johnson retaliated against Che by creating a hostile work environment. A supervisor can be liable for a retaliatory hostile work environment if, among other things, the alleged harassment was severe or pervasive. See Marrero v. Goya of P.R., Inc., 304 F.3d 7, 26 (1st Cir. 2002). In deciding whether the harassment was sufficiently severe or pervasive, the fact finder must examine all the circumstances. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). These circumstances include the frequency and severity of the discriminatory conduct, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with the employee's work performance, and the effect of the conduct on the employee's psychological well-being. See id. As a general matter, these are questions best left for the jury. See Marrero, 304 F.3d at 19. "The barrier to reversal on this ground is high, given the jury's superior ability to gauge the witnesses and draw inferences in favor of one side or the other on this highly factual issue." Danco, Inc. v. Wal-Mart Stores, Inc.,

178 F.3d 8, 16 (1st Cir. 1999).  We see no reason to disturb the jury's verdict.

There was sufficient evidence from which a reasonable jury could find that Che was subjected to a hostile work environment.  There was evidence that Che received undeserved or excessive discipline on multiple occasions over a roughly two year period.  By way of example, Johnson attempted to demote Che to streetcar operator in late 1994 because Che refused to sign a disciplinary slip.  Later, the MBTA changed the demotion to a three day suspension.  In 1995, Che was reprimanded for reporting an automobile accident using a telephone instead of his radio, despite the fact that MBTA regulations specifically permitted employees to report such accidents with either a telephone or a radio.  The reprimand was later expunged from Che's record by the MBTA.  There was also evidence that Che was told to use his radio less frequently even though doing so would hamper his work performance and that Che was improperly scolded for requesting meal breaks.

In addition, there was evidence that employees were permitted to scream at Che without punishment.  There was evidence that Che complained to Johnson that another manager was harassing him, but Johnson never told the manager to stop.  There was evidence that Johnson and other supervisors referred to Che as a "chink."  Lastly, there was evidence that the defendants' conduct caused Che to suffer psychological and physical aliments.  Viewed

-16-

collectively and in the light most favorable to Che, this evidence is sufficient for a reasonable jury to find that Johnson subjected Che to a hostile work environment.

C.  Punitive Damages

At the close of Che's evidence, but before the defendants' presented their case, the district court ruled that there was "absolutely no proof justifying the submission of punitive damages to the jury."  The district court was also concerned that its "suggestion to the jury that this was an egregious case might effect an award of compensatory damages on a subconscious basis."  We review de novo a district court's decision on whether there was sufficient evidence for a jury instruction on punitive damages.  See Marcano-Rivera v. Pueblo Int'l., Inc., 232 F.3d 245, 254 (1st Cir. 2000).

The Supreme Court has explained that punitive damages in discrimination cases are authorized "in only a subset of cases involving intentional discrimination."  Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 534 (1999).  In order to fall within that subset "[t]he employer must act with malice or reckless indifference to the plaintiff's federally protected rights."  Id. at 535 (quotation marks omitted) (emphasis in original).  The Court has explained that this means "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law."  Id. at 536.  This inquiry is centered around

the subjective knowledge or intent of the employer.  See Romano v. U-Haul Int'l, 233 F.3d 655, 669 (1st Cir. 2000).

Prior to Kolstad, the rule in this circuit was that "the evidence of intent that is necessary to support a punitive damages award is the same evidence of intent that is required for a finding of discrimination in the first place."  Criado v. IBM Corp., 145 F.3d 437, 445 (1st Cir. 1998) (citations and quotation marks omitted).  After Kolstad, we have been careful to differentiate between cases where the evidence of the defendant's state of mind "relates only to the conduct, not to the consequence; that is, it entails an intent to do the act, not to effect a civil rights violation."  Iacobucci v. Boulter, 193 F.3d 14, 26 (1st Cir. 1999).  Nevertheless, we have not abandoned our pre-Kolstad jurisprudence altogether.  Instead, we have taken a more cautious approach and disavowed our previous case law only to the extent that it "fails to draw a distinction between the state of mind requirement anent the actor's conduct and the state of mind requirement anent the effects of that conduct."  Id. at 27.

In fact, we have continued to recognize that "acts of intentional discrimination are just the sort of conduct that punitive damages are aimed to deter."  DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 38 (1st Cir. 2001); see also Hemmings v. Tidyman's, Inc., 285 F.3d 1174, 1198 (9th Cir. 2002) (stating "that after Kolstad, in general, intentional discrimination is enough to

-18-

establish punitive damages liability"). The present case involves intentional discriminatory retaliation. The jury found that Che was demoted because he engaged in conduct protected by federal anti-discrimination laws. When a jury finds that an employer has engaged in intentional discriminatory retaliation, the employer's actions and the effect of those actions are closely connected in a way not necessarily present in other types of cases.

In Iacobucci, for example, we held in the context of a false arrest claim brought under § 1983 that although an officer's split-second decision to arrest the plaintiff was unreasonable, there was no evidence suggesting he possessed any malice or reckless indifference to the plaintiff's constitutional rights. 193 F.3d at 26. In contrast, when an employer retaliates against an employee because the employee engages in conduct that is protected by well-established federal civil rights statutes, a jury could, but need not, fairly infer that the employer harbored malice or reckless indifference towards those civil rights. See Rubinstein v. Admin'rs of Tulane Educ. Fund, 218 F.3d 392, 406 (5th Cir. 2000) (holding that, where there is evidence that employer retaliated because employee filed previous lawsuits, such evidence "certainly indicates a healthy disdain for [plaintiff's] rights to seek redress in the courts for perceived wrongs adequate to meet the standard of reckless indifference at least, if not outright animus, towards those rights"); Passantino v. Johnson & Johnson

Consumer Prods., Inc., 212 F.3d 493, 516 (9th Cir. 2000) (holding that jury could find malice or reckless indifference to an employee's federally protected rights because her employer's actions were "in retaliation for her complaints").

This is not to say that punitive damages will be appropriate in every case involving intentional discrimination. See Rowlett v. Anheuser-Busch, Inc., 832 F.2d 194, 205 (1st Cir. 1987). The Court has described situations where an employer may intend to discriminate, but does not intend to violate the law. See Kolstad, 527 U.S. at 536-37. These include situations when the employer is unaware of the federal law prohibiting discrimination, when the employer believes he can lawfully discriminate, when the underlying theory of discrimination is novel or poorly recognized, or when the employer believes its discrimination falls within a statutory exception. See id. None of these situations, or others like them, are present in this case. Nor do we see any other compelling reason why a jury should be prevented from exercising its "discretionary moral judgment" as to punitive damages in this case. Smith v. Wade, 461 U.S. 30, 52 (1983). Accordingly, the district court's denial of Che's requested jury instruction on punitive damages is reversed.

On remand, we believe the proper route is to let stand the jury's award of compensatory damages, but retry the issue of punitive damages. We have "broad discretion to remand for a new

-20-

trial on all, or some, of the issues in the case." Dopp v. HTP Corp., 947 F.2d 506, 518 (1st Cir. 1991). We do not think that the district court's error regarding the punitive damages instruction nullifies the jury's findings that the defendants are liable for discriminatory retaliation and the creation of a hostile work environment. See Dopp, 947 F.2d at 518; Santiago-Negron v. Castro-Davila, 865 F.2d 431, 437 (1st Cir. 1989). Thus, the jury's award of compensatory damages is affirmed and the case is remanded for a new trial on the issue of punitive damages. See McKinnon v. Kwong Wah Rest., 83 F.3d 498, 509 (1st Cir. 1996) (affirming district court's award of compensatory damages, but remanding on the issue of punitive damages).

D. Motion for Reinstatement or Front Pay

In light of our ruling that a new trial is required for punitive damages, we believe it proper to leave the question of reinstatement or front pay open for the district court to determine following the jury's determination of damages. Reinstatement and front pay are equitable remedies that require the district court to take a "flexible approach." Selgas v. Am. Airlines, Inc., 104 F.3d 9, (1st Cir. 1997). In view of the fact that the damages awarded to Che could change, the district court deserves the opportunity to consider these changes in fashioning equitable relief. See Lussier v. Runyon, 50 F.3d 1103, 1112 (1st Cir. 1995) (stating that a district court's decision on a particular form of relief "must be

assessed as part of the entire remedial fabric that the trial court has fashioned in a particular case").  However, we do offer the district court some guidance on the issue of reinstatement.

In cases such as this one, which involve employment discrimination under Title VII, a district court's discretion to fashion an equitable remedy must be consistent with the important national goals reflected in the statute.  See Selgas, 104 F.3d at 12; Lussier, 50 F.3d at 1111.  As the Supreme Court has explained, the goals of Title VII include "eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."  Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975).  We have recognized that reinstatement is an important remedy because it "most efficiently" advances the goals of Title VII by making plaintiffs whole while also deterring future discriminatory conduct by employers.  Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 19 (1st Cir. 1999); see also Hiraldo-Cancel v. Aponte, 925 F.2d 10, 13 (1st Cir. 1991).  As a result, we have said that in employment discrimination cases, "the overarching preference is for reinstatement."  Selgas, 104 F.3d at 13.  It is clear to us that "equitable considerations different in kind or degree from those regularly accompanying reinstatement must be present," if this important remedy is to be denied.  Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 323 (1st Cir. 1989).

We have highlighted a number of special considerations that could form the basis for a denial of reinstatement.[1] See Velazquez v. Figueroa-Gomez, 996 F.2d 425, 429 (1st Cir. 1993). Although the list is certainly not exhaustive, the district court on remand should analyze whether any of these factors are present in this case. We have also recognized, as did the district court in its decision denying Che's reinstatement, that government operations can be burdened because of the hostility that results from reinstatement. See Hiraldo-Cancel, 925 F.2d at 13-14. But we have repeatedly said that such burdens and hostility are not enough to justify a denial of reinstatement, absent special circumstances. See Velazquez, 996 F.2d at 429; Hiraldo-Cancel, 925 F.2d at 14; Rosario-Torres, 889 F.2d at 323. The reason we have adopted such a rule is because the goals of Title VII would be ill served if we permitted such routine antagonism to be an adequate ground for denying reinstatement. See Quint, 172 F.3d at 21.

We do not agree with the district court that "Che's presence would likely be more disruptive than in the ordinary, garden-variety, return-to-work scenario," because two of the

---

[1]"In the past, we have indicated a number of special considerations that influence the district court determination in specific cases, including: (1) the strength of the evidence . . .; (2) whether the discharged employee has found comparable work; (3) the absence of a property right in the position because the employee was hired in violation of local law; and (4) the ineligibility of the employee for the position, due to failure to meet established qualifications, which would permit immediate discharge for no reason or for any permissible reason." Id.

-23-

witnesses who testified at trial against Che would be his supervisors, and a named defendant is currently in charge of the Green Line. The participation of supervisors and coworkers in a plaintiff's employment discrimination case is common and often unavoidable. These attendant antagonisms are precisely the type of "routinely incidental burdens" that are a foreseeable consequence of the defendants' misconduct, and therefore "insufficient, without more, to tip the scales against reinstatement." Rosario-Torres, 889 F.2d at 322. This is not to say, of course, "that coworker hostility adequately proven real and intolerable, may not provide an appropriate ground for refusing reinstatement." See Quint, 172 F.3d at 21. (emphasis in original). Rather, it is a recognition that, given the importance of reinstatement as a remedy in employment discrimination cases, there must be evidence in the record aside from an employer's mere participation in the trial to support a finding of extraordinary antagonism if that is to be the basis for the district court's denial of reinstatement.

E. Constructive Discharge Jury Instruction

Lastly, the defendants appeal the district court's decision not to instruct the jury that Che was required to prove that he was constructively discharged. The defendants objected at the proper times, and our review is therefore de novo. See Gray v. Genlyte Group, Inc., 289 F.3d 128, 133-34 (1st Cir. 2002). Like the district court, we are not persuaded by the defendants'

argument. This case involves discrimination by way of retaliation and the creation of a hostile work environment. The elements of these two different claims are well settled in our circuit. See White, 221 F.3d at 259, 262. Suffice it to say, neither cause of action requires that the plaintiff be actually or constructively discharged. See Kosereis, 331 F.3d at 216-17 (involving plaintiff who brought hostile work environment and retaliation claims while still employed by defendant). Thus, the district court correctly denied the defendants' requested jury instruction. Having concluded that the defendants' requested jury instruction lacked merit, we rule that the district court did not abuse its discretion in denying the defendants' corresponding motion for a remittitur of Che's back pay award. See Trull v. Volkswagen of America, Inc., 320 F.3d 1, 9 (1st Cir. 2002) (stating that motions for remittitur are reviewed for abuse of discretion).

## III. CONCLUSION

The district court's ruling denying Che's requested jury instruction on punitive damages is **REVERSED** and this case is **REMANDED** for a new trial on punitive damages. We leave the district court to exercise its discretion to award reinstatement or front pay in light of the outcome of the proceedings on remand. In all other respects, the district court's rulings are **AFFIRMED.** So ordered.