Lamonthe v. NH Dept. of Corrections   CV-02-442-JD  10/24/03

UNITED STATES DISTRICT COURT FOR THE
                    DISTRICT OF NEW HAMPSHIRE


<u>Yvan Lamothe</u>

        v.                              Civil No. 02-442-JD
                                        Opinion No. 2003 DNH 180
<u>New Hampshire Department</u>
<u>of Corrections</u>


                            O R D E R


     The plaintiff, Yvan Lamothe, brings claims under Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.,

alleging workplace discrimination based on his race and national

origin.  The New Hampshire Department of Corrections ("DOC"),

Lamothe's former employer, moves for summary judgment on the

grounds that Lamothe's claims are time barred and that he lacks

evidence to prove them.  Lamothe objects to summary judgment.


                      <u>Standard of Review</u>

     Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).  The party seeking summary judgment must first demonstrate

the absence of a genuine issue of material fact in the record.

See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party. See id. at 255.

## Background

Yvan Lamothe, who is black and was born in Haiti, was hired by the DOC in February of 1986. He had a Bachelor's Degree in Human Services Administration and a Master's Degree in Counseling and Human Services. In 1987, he was hired by the DOC as a Probation/Parole Officer ("PPO"). He was employed by the DOC until February 15, 2001.

He was one of only two or three black PPOs of a total of seventy-five PPOs employed by the DOC. Sterling Wheeler and Carol Cochrane were African-American PPOs and were co-employees of Lamothe. Edward Leonard Ziefert, who is Jewish, was also a PPO and a co-employee. During Lamothe's employment, the DOC employed no blacks or Hispanics in positions of Chief, Assistant Director, or Director of the Probation/Parole Office or in supervisory positions in the DOC as a whole. He states that he was subjected to racial slurs and comments during his employment

2

and that Wheeler, Cochrane, and Ziefert experienced discrimination based on race, ethnicity, and religion.

In 1999, Lamothe applied for the position of Assistant Director of Field Services along with four other candidates. He went through the hiring process which included submitting a formal application, an initial screening, a panel interview, and a final decision by Donald Parrish, the Director of Field Services. Joanne Fortier, who was also a PPO, was hired for the position. Lamothe believed that he was more qualified for the position and that Fortier had been preselected because both the DOC Acting Commissioner, Etta Cantor, and Director Parrish favored her.

The position of Director of Field Services became vacant in the spring of 2000. Lamothe applied for the position. After the deadline for applications was extended several times, the new DOC Commissioner, Philip Stanley, circulated a memorandum in which he explained that he wanted to extend the applicant pool. Stanley encouraged Larry Blaisdell, who had previously been Assistant Director of Field Services, to apply for the position. When the application period closed in September of 2000, approximately twenty applications had been submitted.

Commissioner Stanley directed Lisa Currier, the DOC Director of Human Resources, to conduct an initial screening to narrow the

3

number of candidates to seven, which included Lamothe. Those applicants, including Lamothe, were interviewed by a panel of six, comprised of DOC personnel and non-DOC personnel. After the interview process, the panelists recommended that two applicants, Michael Zenk and Larry Blaisdell, should be considered for the position. Stanley interviewed Zenk and Blaisdell separately, and then the candidates were interviewed by a group of DOC employees. Blaisdell, who is white, was hired for the position.

On December 11, 2000, Lamothe injured his back while he was working and did not return to work after the injury. He retired from the DOC effective February 15, 2001. He filed a complaint with the New Hampshire Human Rights Commission on June 7, 2001. Lamothe filed his complaint in this action on September 30, 2002. In the complaint, Lamothe alleges that he received a right to sue letter on July 10, 2002.[1]

---

[1]The record does not appear to include a copy of the complaint submitted to the Human Rights Commission or the right to sue letter. The document appended to Lamothe's complaint, which is referred to as the right to sue letter, is actually a letter from a paralegal in Lamothe's counsel's office addressed to James Owers at Sulloway & Hollis and appears to pertain to an offer of settlement in a different case entirely.

                              Discussion

    Lamothe's claims that he was not hired for the Assistant

Director and Director positions in 1999 and 2000 and that he was

subjected to a hostile work environment because of his race and

national origin.[2]  The DOC moves for summary judgment to the

extent Lamothe's claims are based on the 1999 hiring decision on

the ground that such a claim is untimely.  Lamothe does not

address that claim and apparently concedes that it is untimely.[3]

With respect to the 2000 decision, the DOC contends that Lamothe

cannot show discrimination was the reason he was not hired as

Director.  The DOC also contends that evidence is lacking to show

that Lamothe was subjected to a hostile work environment.

_____

    [2]Lamothe, who is represented by counsel, does not state his
claims clearly in the complaint but accepts the claims as
described by the DOC in its motion.

    [3]As a prerequisite for a Title VII claim, a plaintiff must
exhaust administrative remedies by filing a complaint with the
Equal Opportunity Employment Commission or the local
administrative agency authorized to handle such complaints.  See
Clockedile v. N.H. Dep't of Corrs., 245 F.3d 1, 4 (1st Cir.
2001).  When the state agency is authorized to handle complaints,
as in this case, the plaintiff has 300 days from the challenged
employment practice to file a complaint.  See 42 U.S.C. § 2000e-
5(e)(1); Madison v. St. Joseph Hosp., 949 F. Supp. 953, 957-58
(D.N.H. 1996).  Because the decision to hire Joanne Fortier,
rather than Lamothe, as Assistant Director of Field Services was
made in December of 1999 and Lamothe filed his complaint in June
of 2001, any claim based on that decision is time barred.  See
Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002).

A. Discriminatory Hiring in the 2000 Decision

When as here a plaintiff lacks direct evidence of discriminatory motive in a hiring decision, he may prove his case with circumstantial evidence by using the burden-shifting analysis from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which begins with a prima facie case. Che v. Mass. Bay Trans. Auth., 342 F.3d 31, 38 (1st Cir. 2003). A prima facie case is established by showing that "(1) he is a member of a protected class; (2) he was qualified for the job; (3) the employer took an adverse employment action against him; and (4) the position remained open or was filled by a person with similar qualifications." Kosereis v. Rhode Island, 331 F.3d 207, 212-13 (1st Cir. 2003) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)). The burden of establishing a prima facie case is "not onerous." Williams v. Raytheon Co., 220 F.3d 16, 19 (1st Cir. 2000).

It is undisputed that Lamothe is a member of a protected class, based on his race and national origin, and that he was qualified for the job. It is also undisputed that the DOC's decision not to hire him for the Director of Field Services position is an adverse action within the meaning of Title VII. Larry Blaisdell, who was chosen for the position, and Lamothe had similar qualifications.

6

Once the plaintiff makes a prima facie case of discrimination, an inference arises and the employer must offer a non-discriminatory reason for the decision. Che, 342 F.3d at 39. If the employer meets that burden, the inference of discrimination is effectively countered, and the plaintiff bears the burden of showing that the decision was discriminatory. Id. One means of proving discrimination is to show that the employer's stated reason was a pretext for an underlying discriminatory intent. Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)). Pretext may be shown in a variety of ways, including by statistical evidence of disparate treatment based on race, incidences of disparate treatment based on race in the workplace, or discriminatory comments made by decisionmakers or those who influence decisionmakers. Kosereis, 331 F.3d at 213; Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000).

The DOC states that Lamothe did not get the job of Director of Field Services because other candidates scored higher than he did in the hiring procedures and because he was not recommended by the hiring panel. In addition, the DOC states, Commissioner Stanley knew Larry Blaisdell better and thought he would be good at the job. Lamothe counters that Stanley told him he was not chosen because he lacked management experience, which Lamothe

7

challenges as not true, citing his record as a Unit Manager of the DOC's Halfway House and, previously, as a director of a refugee program in Massachusetts. He also contends that he was excluded from the opportunity of gaining management experience because of the DOC policy of preselecting an individual to fill vacant positions, contrary to the official hiring procedure and in violation of state law. He asserts that the hiring process, ostensibly based on a point system, was a sham to cover hiring Stanley's preselected choice, Larry Blaisdell.

Lamothe cites the deposition testimony of a former Assistant Director of Field Services, Sherwood Vacchs, to support his theory that Larry Blaisdell was Stanley's preselected choice.[4] Vacchs testified that the reason Stanley chose Blaisdell was because Blaisdell was a "wuss" and Stanley did not like employees, like Vacchs, who would stand up to him. Vacchs also testified that as far as he knew, Lamothe's race was not the reason he was not chosen for the job.

Lamothe explains his qualifications for the job and notes

_____

[4]Vacchs's testimony primarily addresses the process used by Donald Parrish, in 1999 and before, which he describes as a "sham." Vacchs was no longer working at the DOC when Lamothe applied for the position of Director of Field Services and Larry Blaisdell was hired for that position. His testimony about that hiring process is based on his own opinion and what he heard from other employees.

8

Stanley's mistaken impression that he lacked managerial experience.  He recounts, in his affidavit, instances when white men and women were hired or promoted into DOC managerial positions with comparable or less experience than he had.  In a Title VII case, however, "'[c]ourts may not sit as super personnel departments, assessing the merits--or even the rationality--of employers' nondiscriminatory business decisions.'"  Kearney v. Town of Wareham, 316 F.3d 18, 25 (1st Cir. 2002) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991)).  Therefore, whether or not Stanley's choice of Blaisdell, over Lamothe, was wise, it is actionable only if motivated by racially discriminatory animus, which is not demonstrated by Vacchs's testimony.  See id.

Lamothe presents his observations, along with the observations of Sterling Wheeler and Carol Cochrane, as to the scarcity of black PPOs, although he also acknowledges the small minority population in New Hampshire.  He provides no evidence of the number of minority applicants for DOC positions in comparison to the number hired.  Lamothe notes that during his DOC employment a black person never served in the position of Chief PPO, Assistant Director, or Director and that the DOC has no black or Hispanic supervisors or managers.  Lamothe presents no evidence, other than his own experience, of black applicants for

9

those positions who were not hired or evidence of other racially discriminatory hiring or promotion decisions.

Despite the incidents of discrimination Lamothe, Sterling Wheeler, Carol Cochrane, and Lenny Ziefert describe, Lamothe does not show or suggest that Stanley or any members of the hiring panel were involved in any discriminatory incidents or harbored discriminatory animus.[5]  To the contrary, the record shows that Lamothe had no reason to believe that Stanley or any of the panelists was biased against him because of his race or his national origin.  Taken in the light most favorable to Lamothe, the record supports his charge that Stanley recruited Blaisdell to apply for the position and favored him for the position.  The record does not include any evidence, however, that such favoritism was based on race.  Therefore, Lamothe has not carried his burden of showing that a material factual issue exists as to whether he was denied the Director of Field Services position because of his race.

---

[5]Instead, Lamothe argues that an incident involving an African-American applicant for a PPO position in 1995 shows that Lisa Currier, the DOC Director of Human Resources, was biased against African Americans.  Even if the incident recounted by the applicant demonstrated bias, which is far from clear, Currier included Lamothe in the screened group that was presented to the hiring panel.  Lamothe has not shown that any discriminatory bias Currier may have harbored affected him.

B.  Hostile Work Environment

It is an unlawful employment practice under Title VII for an employer to require an employee "'to work in a discriminatorily hostile or abusive environment.'"  Crowley v. L.L. Bean, Inc., 303 F.3d 387, 394 (1st Cir. 2002) (quoting Harris v. Forklift Sys., 510 U.S. 17, 21 ((1993)).  To be actionable, however, "'the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Gorski v. N.H. Dep't of Corrs., 290 F.3d 466, 471 (1st Cir. 2002) (quoting Harris, 510 U.S. at 21).  Incidents involving other employees or comments directed at other employees may be relevant to a hostile work environment claim in certain circumstances.  See, e.g., Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 190 (2d Cir. 2001); McPhaul v. Bd. of Com'rs, 226 F.3d 558, 567 (7th Cir. 2000).

The timely filing provision of Title VII requires a complaint to be filed within the applicable time period after at least one act that contributed to a hostile work environment. Nat'l R.R. Passenger Corp., 536 U.S. at 117.  As noted above, the applicable time period here is 300 days.  Because Lamothe filed his complaint with the New Hampshire Commission on Human Rights on June 7, 2001, at least one act that contributed to the claim

11

must have occurred after early August of 2000 and before he left due to injury in December of 2000.

Lamothe does not identify one act or comment directed to him that occurred within that time period. He points to incidents involving Wheeler, Cochrane, and Ziefert, but none of the incidents described occurred between August and December of 2000.[6] Therefore, his hostile environment claim is time barred.

Even if the claim were timely, however, Lamothe has not provided sufficient evidence of a hostile work environment to avoid summary judgment. "An employee states a claim under Title VII if he alleges offensive, race-based conduct that is severe or pervasive enough to create an objectively hostile or abusive work environment and is subjectively perceived by the victim as abusive." Landrau-Romero v. Banco Popular de P.R., 212 F.3d 607, 613 (1st Cir. 2000). The harassment must be sufficiently severe or pervasive to alter the conditions of his employment. Kosereis, 331 F.3d at 216; Crowley, 303 F.3d at 395. "'[W]hether

---

[6]If anti-Semitic comments or incidents are relevant to Lamothe's claim, he has not shown that the events described by Ziefert in his deposition occurred after mid-August of 2000 and before he left the DOC because of injury in December of 2000. To the extent a time context may be gleaned from the excerpts of the deposition testimony submitted by Lamothe, it appears that most of the incidents occurred in the 1990s although one incident involving "Keith" may have occurred in December of 2002. Lamothe makes no effort to provide any detail or time context for these incidents.

an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Landrau-Romero, 212 F.3d at 613 (quoting Harris, 510 U.S. at 23).

The first hostile incident Lamothe recounts occurred when he was introduced to the PPOs when he was hired in 1987.  When the Director introduced him as a Haitian, Lamothe heard someone say "AIDS," which he interpreted to mean that he was viewed as someone likely to be infected with HIV, which he found hurtful.  Other PPOs referred to Lamothe as "Flashlight," which was a nickname first given him when he worked in the Forensic Unit before becoming a PPO.  Lamothe explains that the nickname refers to the size of his penis.  He also notes that a fellow employee and friend, Gregg Compton, "had a terrible habit of saying [] 'why don't you go back to Haiti.'"

In 1990, after Lamothe and a white PPO made a home visit on a parolee, someone called the Manchester police to report that two men had been prowling in the neighborhood, where the PPOs visited, and that one of the men was wearing a black mask.  That incident caused many laughs in the next few days.  Also in 1990,

13

a fellow PPO made remarks to Ziefert about David Duke, a Nazi candidate for office, and Adolf Hitler. When Ziefert complained, Director Parrish yelled at Ziefert instead of addressing the anti-Semitic remarks.

Sometime in the late 1900s, Ziefert was given a copy of a cartoon of an aboriginal man, with a bone in his nose, and the caption "Lenny's Uncle" by the department secretary who said it had been submitted for the department newsletter. Ziefert knew it was submitted by Dan Kierstead who was chief of the Claremont district office. Ziefert shared the cartoon with Lamothe and they both were offended.

Lamothe states that he was subjected to a number of inappropriate jokes during his employment as a PPO. He provides one example, without a time frame, about a man with a monkey on his shoulder who explained the monkey was from Africa. Lamothe says that he, along with Wheeler and Cochrane, had experiences where a fellow employee returning from a vacation would compare his or her skin color to theirs. Lamothe also cites the lack of sensitivity training for PPOs, after requests for such training were made by Wheeler, Cochrane, and Ziefert, and the lack of minority employees as evidence of a hostile work environment.

Title VII does not address name calling, teasing, isolated incidents, and offhand remarks. <u>Kosereis</u>, 331 F.3d at 216.

14

Lamothe has not demonstrated that any of the comments or incidents he describes were frequent, severe, or physically threatening to him, or that the environment affected his work performance.[7]  Instead, the circumstances he describes fall into the crude, inappropriate, and insensitive workplace antics that unfortunately occur but are not actionable under Title VII.  See id.  As such, he has not demonstrated a material factual issue as to the existence of an actionable hostile work environment.


## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment (document no. 9) is granted.  The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
United States District Judge

October 24, 2003

cc:  John G. Vanacore, Esquire
     Nancy J. Smith, Esquire

_____

[7]The court, of course, makes no assessment of discrimination that may have been experienced by other PPOs.