Fred SHOUCAIR

v.

BROWN UNIVERSITY.

No. 2005–145–Appeal.

Supreme Court of Rhode Island.

March 9, 2007.

Andrew Berg, Providence, for Plaintiff.

Thomas Bender, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

Professor Fred Shoucair was, by all accounts, a dedicated and qualified teacher in the division of engineering at Brown University, but in today's world of major research universities that is often not enough to merit tenure. After he was denied tenure in 1993, Shoucair filed a civil action against Brown, alleging unlawful employment practices in violation of the Fair Employment Practices Act. Brown maintained that, in effect, Shoucair fell short of tenure by virtue of a modern corollary to the venerable "publish or perish" adage—one that assesses professors/researchers on their ability to attract lucrative grants on a regular basis. It appears that the jury, however, found that Shoucair's demise at Brown resulted from his unfortunate encounter with another time-honored tradition of higher education: petty politics. Yet, contrary to the notoriously acerbic observation that "academic politics are so vicious precisely because the stakes are so small," [1] the stakes for Fred Shoucair in this case loomed very large indeed.

Brown University now appeals from the trial justice's denial of its motion for judgment as a matter of law under Rule 50 of the Superior Court Rules of Civil Procedure, contending that the evidence adduced at trial failed to establish that the denial of Shoucair's quest for tenure was the result of any illicit employment activity. In the alternative, Brown avers that the punitive and compensatory damages Shoucair was awarded must be vacated for lack of sufficient evidence. For his part, Shoucair has filed a cross-appeal, asserting that the trial justice's reduction of the jury's back pay award was unsupported and unreasonable and that the trial justice should have ordered Brown to reinstate Shoucair with tenure or, in lieu of reinstatement, should have awarded him front pay.[2] For the reasons set forth below, we vacate the award of punitive damages and affirm the judgment in all other respects.

## I

### Facts and Travel

Fred Shoucair, Ph.D., joined the Brown faculty as an assistant professor in the electrical sciences group of the division of engineering in July 1987. His duties as assistant professor included teaching undergraduate- and graduate-level courses, supervising the research of doctoral candidates, conducting his own research and pursuing grants to finance that research. Shoucair's particular area of expertise focused on electronics for severe environment; his research in that vein aimed at enhancing the functional capacity of elec-

---

1. This oft-repeated academic saw is routinely attributed to Dr. Henry Kissinger, but may have originated with Woodrow Wilson's observation that often "the intensity of academic squabbles he witnessed while president of Princeton University was a function of the 'triviality' of the issues being considered." Ralph Keyes, *The Quote Verifier: Who Said What, Where, and When* 1 (2006).

2. The equitable remedy of front pay is described in 45C Am.Jur.2d *Job Discrimination* § 2640 (2002) as "compensation for future economic losses stemming from present discrimination that cannot be remedied by traditional rightful-place relief, such as hiring, promotion, or reinstatement."

tronics at extremely high temperatures, among other things.

Shortly after Shoucair arrived at Brown, Professor Harvey Silverman invited him to join the Laboratory for Engineering Man/Machine Systems (LEMS group) and Shoucair accepted. The LEMS group consisted of a number of professors in the electrical sciences group, and they met regularly to discuss shared academic and research interests. But Shoucair left the group in May 1990 after he had a falling out with Silverman over a grading controversy that arose in one of Shoucair's undergraduate engineering classes. At that time, Silverman was the director of undergraduate programs in the division of engineering, and he summoned Shoucair to his office to discuss what Silverman deemed to be a disproportionately large number of noncredit grades Shoucair had turned in for his "Engineering 52" class. According to Shoucair, Silverman told him, "You graded like a son of a bitch, like a bastard," and demanded that he change the grades. When he refused, Shoucair testified, Silverman left the room, returned with two other professors, and proceeded to alter the grades on Shoucair's grade sheets. When then asked to sign the altered grade sheets, Shoucair said that he acquiesced only after the three professors agreed to write a note acknowledging that Shoucair was acting under protest. Subsequently, Shoucair wrote a letter of complaint to Professor Arto Nurmikko (head of the electrical science faculty) and to Dean of Engineering Alan Needleman. Dean Needleman then ordered that the original grades be restored. Still later, in June 1990, Dean Needleman requested that Shoucair meet with Nurmikko and another colleague, Professor Jan Tauc, to review the exams once more. Shoucair agreed to meet with Nurmikko and Tauc, and after that meeting he accepted their recommendation that he lower the passing score for the Engineering 52 exam by ten points and adjust his grades accordingly.

It is abundantly clear from a review of the voluminous trial transcripts that Harvey Silverman is the *eminence grise* of Shoucair's narrative, and that Shoucair's primary theory of recovery was ethnic discrimination. Most of his evidence tended to support his contention that Silverman carefully orchestrated the denial of his tenure. The jury, however, rejected this allegation and instead predicated Brown's liability on a second theory of recovery advanced by Shoucair, *i.e.*, the retaliatory animus of Professor Maurice Glicksman, a close associate of Silverman's.

When Shoucair came up for tenure at Brown in 1992, Silverman, who then was the Dean of Engineering, appointed Glicksman to convene a tenure review committee to begin the evaluation process. Dean Silverman recused himself from the proceedings because in the wake of the 1990 grading dispute, he and Shoucair were not on speaking terms. Professor Glicksman enlisted Professor Nabil Lawandy and Professor Subra Suresh to round out the three-person tenure review committee (TRC). Professor Glicksman then contacted Shoucair to alert him to the composition of the committee and to request an updated curriculum vitae and a list of suggested references. Professor Shoucair complied, and the TRC mailed evaluation requests to ten references, some of whom had been suggested by Shoucair himself, and others whom the committee sought out independently.

As he was compiling Shoucair's tenure dossier over the course of the 1992–93 academic year, Glicksman was also co-chairing a search committee to hire a new faculty member in the electrical sciences division to replace Professor Jim Rosenberg, who was resigning. On February

19, 1993, Dean Silverman sent a memorandum to all tenured engineering faculty announcing that the search committee had recommended hiring Eli Kapon, Ph.D., and that a meeting to vote on this recommendation would convene on February 26, 1993. The tenured faculty approved the search committee's recommendation, but Brown's Affirmative Action Monitoring Committee (AAMC) was not prepared to accept the recommendation until, according to Glicksman's report to the Engineering Executive Committee (EEC), the department interviewed one more "viable under-represented minority candidate (Asian)." Between March 4 and March 16, 1993, Glicksman brought a qualified minority candidate to campus for interviews, and shortly thereafter he informed the EEC that the interview process was "concluded" and that an offer would be extended to Kapon, whom "the tenured faculty had already approved." At trial, there was some confusion about the timing of the minority candidate's interview and the official offer to Kapon. Bryan Shepp, dean of the faculty, testified that he made the official offer after clearing the EEC's recommendation with the AAMC, but he could not attach specific dates to those actions. Dean Silverman himself wrote to Kapon on March 19, 1993, to congratulate him on his appointment and to encourage him to accept it.

According to Shoucair, it was his belief Kapon had already been offered the position that led him to question Glicksman's secretary, Sandy Spinacci, when she contacted Shoucair in early March to ask that he interview the additional minority candidate. Professor Shoucair testified that he believed Silverman's February 19 memorandum meant that "the job had been offered to * * * [Mr.] Kapon" and that he was unaware of AAMC's subsequent objection and the resulting extension of the interview process. Professor Shoucair

asked Ms. Spinacci to confirm which opening the candidate she was asking him to interview was applying to fill. Shoucair recalled that when Ms. Spinacci called back to confirm that the interview was for the Rosenberg opening, she also informed him that the interview was being conducted for "some affirmative action considerations." Professor Shoucair testified that in declining to do the interview, he also noted to Ms. Spinacci his concern that it might be illegal to interview a candidate for a position that had already been offered to someone else. Ms. Spinacci testified that she was not aware at the time whether Brown had already offered another candidate the position that Rosenberg vacated.

Professor Shoucair also testified that a week or two after he told Ms. Spinacci that he did not wish to participate in the interview, Glicksman showed up at his office, unannounced, with the minority candidate whom Shoucair previously had declined to interview. Professor Glicksman asked Shoucair to spend roughly fifteen minutes with the candidate, and Shoucair, in spite of his earlier objections, reluctantly did so.

Shortly thereafter, on March 23, 1993, the TRC chaired by Glicksman voted to recommend Shoucair for tenure. The generally positive recommendation report that Glicksman authored came with a significant disclaimer, however; the committee members endorsed Shoucair for tenure, but professed that they were unable to do so "with enthusiasm." This caveat, according to the report, was based on the committee's opinion that Shoucair was "not contributing at the level we would like to see, to the visibility of our research program (in competitive, peer-reviewed on-site funding of research) and to the support of our graduate students and programs." Professor Glicksman distributed the tenure review committee's report to all

tenured faculty in the electrical sciences group.

On March 24, 1993, seven of the electrical sciences group's nine members convened to review the TRC report and decide on their support for Shoucair's candidacy. Dean Silverman attended the meeting, but he and Glicksman both abstained from what turned out to be a five to zero vote in favor of a motion to allow Shoucair's contract to lapse at the end of the 1993–1994 academic year, and thus not to award him tenure. In the subsequent report that Glicksman disseminated to all tenured faculty in the engineering division, he explained that "although Fred Shoucair's record is a competent one, it is not one that promises some distinction, and the particular lack of contract/grant awards and the lack of support for graduate students do not show promise for future positive contributions." Professor Glicksman apprised Shoucair of this turn of events, and told Shoucair that he was entitled to attend the next engineering division meeting and make his case to the tenured faculty before they, too, assessed his candidacy. Professor Shoucair demurred, choosing rather to make himself available to answer any questions that might arise. There were no questions for Shoucair, and the tenured faculty of the engineering division followed the lead of the electrical sciences group, voting fifteen to five (with four abstentions) against tenure for Shoucair. Professor Glicksman conveyed this result to Shoucair and also informed Shoucair of his right to be heard when the Committee on Faculty Reappointment and Tenure (ConFRaT) met to consider his case before making its recommendation to the provost.

Professor Shoucair did appear at the ConFRaT meeting on May 17, 1993. After the committee had asked several questions of Silverman, Glicksman, and Lawandy, Dean Shepp introduced Shoucair and Professor Peter Richardson, a colleague of Shoucair's in the engineering division who was acting as his advisor. Professor Shoucair answered questions from those in attendance, including Provost Frank Rothman. At the meeting's conclusion, the ConFRaT members voted seven to one to deny Shoucair's tenure application and allow his contract to expire on June 30, 1994. In protest, Shoucair filed a grievance with the Faculty Executive Committee (FEC) on May 27, 1993, alleging violations of his academic freedom and a "failure of the University to follow prescribed procedures in matters relating to reappointment or promotion." Professor Shoucair named Silverman and Glicksman as respondents in his grievance, along with seven unknown "co-conspirators" who participated in the electrical sciences group's vote against the initially positive, albeit unenthusiastic, endorsement of the tenure review committee. Most of Shoucair's complaints focused on Silverman's alleged bias because of the grading incident and failure to recuse himself completely from the tenure review proceedings. Professor Shoucair faulted Glicksman for his "reckless dissemination of the [electrical sciences] sub-group's tainted vote" and his failure to provide Shoucair with the engineering division's "Criteria for Evaluation and Promotion." Professor Shoucair also alleged that he had been "individually discriminated against because of ethnic origin."

Beginning in September 1993, an ad hoc committee convened by the FEC heard testimony pertaining to Shoucair's grievance. It was during these proceedings that Shoucair first alleged that Glicksman had undermined his tenure bid in retaliation for Shoucair's professed misgivings about interviewing the minority candidate for the Rosenberg opening. The ad hoc

committee did not find this particular charge relevant to Shoucair's grievance and did not pursue it. Ultimately, this committee found "that the evidence presented * * * does not support the charges by Prof. Shoucair of violation of his academic freedom, failure of the University to follow prescribed procedures in matters relating to reappointment and promotion, or discrimination against him as an individual because of ethnic origin." Professor Shoucair made one last-ditch plea to Brown's then-President, Vartan Gregorian, but to no avail; after the ad hoc committee's decision, Shoucair effectively was finished at Brown. His contract expired on June 30, 1994.

Professor Shoucair remained in Providence for roughly another year and a half after he left Brown University. He worked as a consultant for a computer company owned by a former student of his, and he also continued to supervise the work of the last remaining doctoral candidate with whom he had been associated at Brown. Professor Shoucair testified at trial that he submitted "around the order of a hundred" employment applications to colleges and universities between 1994 and 1995, but had received no offers. In early 1996, Shoucair moved to California and accepted a part-time, adjunct teaching position at the University of California–Berkeley. He continued in that capacity at Berkeley until the end of 1999, but eventually left because he believed the position offered no opportunities for advancement. Since leaving UC–Berkeley, Shoucair has done some consulting and volunteer work, but has had "no steady income."

Professor Shoucair filed the lawsuit underlying the instant appeal in May 1996. He alleged that (1) Brown had "tolerated and even condoned" an ethnically hostile work environment created by Dean Silverman in the division of engineering; (2) Professor Glicksman, acting as an agent of Brown, had retaliated against Shoucair for opposing Glicksman's discriminatory interviewing practices; and (3) Shoucair was denied tenure because of his national/ancestral origin. Professor Shoucair sought a declaratory judgment that Brown's actions and practices in his case violated the Fair Employment Practices Act (FEPA), G.L. 1956 chapter 5 of title 28,[3] and in addition to back pay and benefits, compensatory damages, punitive damages and attorney's fees, he asked the court to direct Brown to place him "in the position he would have occupied but for defendant's discriminatory and retaliatory treatment of him." At the conclusion of the trial in May 2003, the jury found for Shoucair on the retaliation claim only and awarded him $400,000 in back pay, $175,000 in compensatory damages, and $100,000 in punitive damages. Brown then renewed the motion for judgment as a matter of law under Rule 50 that it had pressed at both the close of plaintiff's case and at the close of the evidence. In the alternative, Brown moved for a new trial based on Rule 59 of the Superior Court Rules of Civil Procedure. Brown also moved to strike the punitive and compensatory damage awards. Professor Shoucair moved for reinstatement or, alternatively, for an award of front pay; he also moved for attorney's fees.

---

**3.** General Laws 1956 § 28–5–3 declares that it is

"the public policy of this state to foster the employment of all individuals in this state in accordance with their fullest capacities, regardless of their race or color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin, and to safeguard their right to obtain and hold employment without such discrimination."

After hearing arguments on the parties' respective motions, the trial justice denied Brown's Rule 50 and Rule 59 motions, but did reduce Shoucair's back pay award by 30 percent. The trial justice awarded Shoucair attorney's fees and costs, but denied his motions for reinstatement and front pay. Final judgment was entered on February 15, 2005. Brown timely filed a notice of appeal to this Court, and Shoucair followed with a timely cross-appeal.

## II

## Motion for Judgment as a Matter of Law

### A. Standard of Review

■■■ On appeal, Brown contends that the evidence failed to establish Shoucair's retaliation claim as a matter of law. A party appealing from the denial of its motion for judgment as a matter of law shoulders a weighty burden. *Che v. Massachusetts Bay Transportation Authority*, 342 F.3d 31, 37 (1st Cir.2003). In reviewing the trial court's decision, this Court employs "the same rules and legal standards as govern the trial justice." *Perry v. Alessi*, 890 A.2d 463, 467 (R.I.2006) (quoting *Women's Development Corp. v. City of Central Falls*, 764 A.2d 151, 157 (R.I. 2001)). We are required, therefore, to examine the evidence in the light most beneficial to Professor Shoucair, without considering the credibility of witnesses or weighing the evidence, and drawing all reasonable inferences in his favor. *Id.* If such examination reveals factual issues upon which reasonable jurors might draw different conclusions, the trial justice's denial of the motion for judgment as a matter of law must be affirmed. *Id.* We may reverse only when the evidence permits but one legitimate conclusion in regard to the outcome. *Id.* Thus, to set aside the

verdict in favor of Shoucair, we must determine that the evidence is so inconsistent with the verdict that no rational jury could have reached it. *Che*, 342 F.3d at 37. If, however, reasonable minds could differ about the outcome, the issues were submitted appropriately to the jury and its verdict should be preserved. *Perry*, 890 A.2d at 467.

### B. Professor Shoucair's Retaliation Claim

We begin our examination by noting that the trial justice appropriately applied the three-step burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Professor Shoucair alleged that Glicksman retaliated against him because Shoucair had opposed what he perceived to be discriminatory interviewing practices in the division of engineering's hiring process. FEPA prohibits discrimination by employers "against any individual because he or she has opposed any practice forbidden by this chapter * * *." Section 28–5–7(5). In construing FEPA with respect to this thorny allegation of discriminatory retaliation, the trial justice properly followed the clear instructions of this Court's precedent and also looked to the federal courts' interpretations of Title VII of the Civil Rights Act of 1964 for guidance.[4] *See Casey v. Town of Portsmouth*, 861 A.2d 1032, 1036 (R.I.2004) (citing *Newport Shipyard, Inc. v. Rhode Island Commission for Human Rights*, 484 A.2d 893, 897–98 (R.I.1984)). Looking to Title VII precedent, the *McDonnell Douglas* case provides the appropriate framework for evaluation of an employment discrimination case. *See Calero–Cerezo v. United States Department of Justice*, 355 F.3d 6, 26 (1st Cir.2004); *Cen-*

---

4. Civil Rights Act of 1964, § 701 et seq., 42    U.S.C. § 2000e et seq. (2000).

*ter for Behavioral Health, Rhode Island, Inc. v. Barros,* 710 A.2d 680, 685 (R.I. 1998).

■ Under the *McDonnell Douglas* framework, the employee first must make out a *prima facie* case of retaliation. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817. If the employee succeeds, a presumption of discrimination results, and the burden of production, not persuasion, then falls to the employer, who must respond with some legitimate, nondiscriminatory reason for the act at issue. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817. If the employer carries the burden of production, the presumption of discrimination disappears, and the employee then must demonstrate that the employer's proffered explanation amounts to mere pretext. *Barros,* 710 A.2d at 685. To prove a claim of retaliation, an employee must establish that "(1) [the employee] engaged in protected conduct; (2) [the employee] experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Calero–Cerezo,* 355 F.3d at 25 (citing *Gu v. Boston Police Department,* 312 F.3d 6, 14 (1st Cir.2002)). Here, although acknowledging that the trial justice considered the appropriate factors, Brown takes issue with two of her conclusions.

### 1. Protected Activity

On appeal, Brown asserts there was insufficient evidence from which a reasonable jury could find that Shoucair's objection to Glicksman's belated interview

request constituted a "protected activity" under FEPA. Brown contends there was no evidence suggesting that the applicant for the Rosenberg position was denied the position because she was female or Asian, or that Shoucair even knew the applicant's sex or ethnicity when he first expressed his reluctance to do the interview. Yet in light of Brown's candid admission during oral argument that it did not raise this particular issue at trial, this Court will not reach it on appeal.

■ We often have made clear that "[i]t is an established rule of law in Rhode Island that this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court." *Bouchard v. Clark,* 581 A.2d 715, 716 (R.I.1990). Brown cites precedent from the United States Supreme Court [5] as well as this Court [6] to support its position that the "raise or waive" rule is a prudential one and is subject to exception. However, Brown also acknowledges that, because its questioning of whether Shoucair did, in fact, engage in a protected activity under FEPA does not raise a "purely legal" issue, its case "does not fit the existing exception recognized by the Court." To date this Court has deviated from the "raise or waive" restriction only when "basic constitutional rights" are concerned, and "even then only in very narrow circumstances." *Harvey Realty v. Killingly Manor Condominium Association,* 787 A.2d 465, 467 (R.I.2001) (quoting *Rhode Island Depositors Economic Protection Corp. v. Rignanese,* 714 A.2d 1190, 1197 (R.I.1998)). For the exception to apply, the party seeking it must demonstrate the existence of three factors:

---

**5.** *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941).

**6.** *See, e.g., State v. Ramsey,* 844 A.2d 715, 719 (R.I.2004); *Harvey Realty v. Killingly Manor*

*Condominium Association,* 787 A.2d 465, 467 (R.I.2001); *Bassi v. Rhode Island Insurers' Insolvency Fund,* 661 A.2d 77, 79 (R.I.1995).

" 'First, the error complained of must consist of more than harmless error. Second, the record must be sufficient to permit a determination of the issue. * * * Third, counsel's failure to raise the issue at trial must be due to the fact that the issue is based upon a novel rule of law which counsel could not reasonably have known at the time of trial.' " *Id.* (quoting *State v. Smith,* 766 A.2d 913, 919 (R.I.2001)).

Whether Shoucair was engaged in a protected activity is undoubtedly a mixed issue of fact and law that Brown neglected to raise below. Further, because Brown does not attribute its omission to any novel rule of law that reasonably might have evaded its notice at trial, we respectfully decline to extend the scope of the existing exception to reach the issue on appeal.

## 2. Retaliatory Animus

■ The second theory on which Brown assails the trial court's decision posits that no reasonable jury could conclude that retaliatory intent fueled the decision to deny Shoucair tenure. Brown argues that legitimate academic and institutional needs were the only determinative factors, and that as a matter of law Shoucair failed to make the requisite showing of causation between his purportedly protected activity and Brown's decision to deny him tenure. Brown submits that, even if one allows that Shoucair made his *prima facie* case for retaliation, it countered with a permissible alternative explanation for his termination, and thus Shoucair had to go beyond his *prima facie* showing to prove Brown's explanation pretextual. Brown argued that Shoucair's highly specialized area of expertise placed him somewhat on the outskirts of the electrical sciences research landscape. Shoucair's limited field of study, according to Brown, had hindered his capacity to attract significant research grants in the six years leading up

to his tenure review. Brown also pointed out that at every step of the tenure review process, Shoucair's own colleagues expressed doubts that his future research endeavors would be any more likely to bring in the desired level of funding or elevate the prestige of Brown's division of engineering. Brown contends that in the context of Title VII and FEPA cases alike, a defendant's articulation of a viable legal reason for termination imposes upon a plaintiff a burden to prove that reason "unworthy of credence" and that Shoucair has fallen short of that mark. *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097; *see Casey,* 861 A.2d at 1038.

After our review of the evidence, however, we concur with the trial justice's thoughtful decision. In ruling on Brown's motion for judgment as a matter of law, she drew all reasonable inferences in favor of Shoucair and concluded that the evidence did not lead to only one legitimate conclusion about whether Brown's reason for denying him tenure was pretextual. Applying our appellate criteria, we, too, perceive no basis to disturb the verdict of the jury.

The jury and the trial justice were entitled to credit Shoucair's testimony over that of Glicksman and Spinacci, and Shoucair's version of the events, along with evidence he presented, refuted the alternative reasons Brown touted for denying him tenure sufficiently to support a finding of retaliation. *See Vargas Manufacturing Co. v. Friedman,* 661 A.2d 48, 53 (R.I. 1995). As the trial justice pointed out, Shoucair presented testimony to support his qualifications for tenure from respected authorities in his field, and Brown's own tenure review committee recommended, albeit without enthusiasm, that the provost should grant Shoucair tenure. A reasonable person could surmise from this information that Shoucair merited tenure.

■ Professor Shoucair also testified that Glicksman had all but assured him of tenure just days before Shoucair had expressed reluctance to participate in what he deemed to be a "sham" interview and that almost immediately thereafter Glicksman sabotaged his tenure bid by authoring the TRC report with its ambiguous recommendation. Contrary to Brown's contention that mere temporal proximity is not enough to establish causation, an inference of causation is permissible when the adverse employment action comes so swiftly on the heels of the protected activity. *See Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ("The cases that accept mere temporal proximity * * * as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close[.]' "). A survey of persuasive authorities indicates that the week or so that elapsed between Shoucair's refusal of Glicksman's request to interview the minority candidate and the issuance of the tenure review committee's report was within an acceptable range to permit a reasonable inference of causation. *See, e.g., Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (three-month interval insufficient); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2nd Cir. 1996) (twelve-day interval sufficient). That said, temporal proximity only suffices to establish *prima facie* causation, and once Brown articulated its legitimate, nonretaliatory reasons for denying Shoucair's tenure, the *McDonnell Douglas* paradigm required Shoucair to make more than a mere *prima facie* case. *See Rathbun v. Autozone, Inc.,* 361 F.3d 62, 72 (1st Cir. 2004). Indeed, the consensus of federal courts in the Title VII arena is that "[t]he proper standard of proof on the causation element of a * * * retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred 'but for' [the employee's] protected conduct." *Septimus v. University of Houston,* 399 F.3d 601, 608 (5th Cir.2005).

■ To meet his burden, Shoucair had to "do more than simply cast doubt upon the employer's justification." *Barros,* 710 A.2d at 685 (quoting *Resare v. Raytheon Co.,* 981 F.2d 32, 42 (1st Cir.1992)). Shoucair had to build on his *prima facie* case to the extent that the sum of the evidence he presented was such that a reasonable jury could conclude that Brown's justifications for denying him tenure were "unworthy of credence." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097; *Casey,* 861 A.2d at 1038. Professor Shoucair presented evidence suggesting that Glicksman was aware of Shoucair's refusal to interview the additional candidate and that shortly thereafter he authored a very qualified recommendation for Shoucair, submitted it to the electrical sciences group, and then abstained from that group's unanimous vote against Shoucair's tenure. As the trial justice noted, "multiple witnesses testified that this was the first instance they could recall in which the recommendation of the Tenure Review Committee was rejected by the tenured faculty." Professor Shoucair also presented evidence from which the jury could reasonably conclude that the group-level vote sealed his fate, and that the professed independent layers of review that followed were, in fact, nothing more than a formality. We are satisfied that a jury could survey the parties' conflicting testimony and reasonably choose to credit Shoucair's theory of recovery on his retaliation allegation.

Brown points out that the provost ultimately decided on Shoucair's tenure, and cites *Okruhlik v. University of Arkansas,* 395 F.3d 872, 879–80 (8th Cir.2005), to support its contention that the qualified recommendation Shoucair alleged Glicks-

man introduced in the TRC report was merely an intermediate act in a many-layered process and therefore could not constitute an adverse employment action. Brown argues that only the final decision on tenure is actionable, and there is no evidence that the final decision-maker, the provost, knew anything about Shoucair's protected activity or harbored any ill will toward him as a result. But *Okruhlik* goes on to add that a jury reasonably may conclude that even a preliminary evaluation, if based on retaliation or discrimination, influenced the decision-making process and thereby infected the final decision. *Id.* (citing *Roebuck v. Drexel University*, 852 F.2d 715, 727 (3d Cir. 1988)).

In *Mato v. Baldauf*, 267 F.3d 444 (5th Cir.2001), the United States Court of Appeals, Fifth Circuit provided a lucid explanation of the "rubber-stamp" theory Shoucair has invoked to link the provost's actions to Glicksman's alleged retaliatory animus:

"In establishing this causal connection, [plaintiff] must first identify who made the decision that resulted in her termination. For example, *Long v. Eastfield College*, 88 F.3d 300 (5th Cir. 1996), involved an executive officer, on the one hand, with the final authority to fire employees but who had no retaliatory animus toward the plaintiff; and, on the other hand, intermediate supervisors who appeared to have had an improper retaliatory intent and who recommended that an employee be fired. We explained that the causal link between the protected conduct and termination is broken where the official with final authority to fire employees conducts an 'independent investigation' in the course of reaching his or her decision. *Id.* at 307. The causal link is not broken, however, where the decision-maker 'rubber-stamps' the firing recommendation of

* * * subordinates' improper motive. *Id.*; *see also Russell v. McKinney Hospital Venture*, 235 F.3d 219, 226–27 (5th Cir.2000) ('If the [plaintiff] can demonstrate that others had influence or leverage over the official decisionmaker, * * * it is proper to impute their discriminatory [or retaliatory] attitudes to the formal decisionmaker.'). Of course, the degree to which the executive's decision was based on his or her own independent evaluation is a question of fact. *Long*, 88 F.3d at 307." *Mato*, 267 F.3d at 450.

Although it is true that Glicksman did not go so far as to recommend "firing" Shoucair, in the unique context of a tenure review process the jury nevertheless reasonably could have determined that his arguably subtler form of sabotage was just as damaging. The electrical sciences group, the division of engineering, ConFRaT, and the provost all cited the same concerns over Shoucair's research performance and prospects that Glicksman first red-flagged in his initial report. The fact that a subsequent report issued by the Accreditation Board of Engineering and Technology (ABET) during its independent and unrelated certification review of Brown's division of engineering gave Shoucair a "high" rating for his research belies Glicksman's alleged misgivings. And once the jury resolved that Glicksman's animus had contaminated the process, the key question became whether subsequent reviews were truly independent.

Professor Marc Richman, a faculty member in the division of engineering, testified that in his thirty-five years of experience at Brown, it was extremely rare for subsequent reviewers to disregard the recommendation of a professor's own group (in this case, Shoucair's electrical sciences group). Professor Shoucair also established that Silverman, Glicksman,

Shepp, and the provost played bridge together and were friendly with one another. Glicksman and Silverman were particularly close, and given the power the two wielded within the electrical sciences group, it was hardly unreasonable for the jury to doubt the independence of that group's influential vote. *See Lam v. University of Hawaii,* 40 F.3d 1551, 1560–61 (9th Cir.1994) (evidence of prejudice on the part of two voting faculty members, one of whom headed the appointments committee, sufficient as a matter of law to preclude summary judgment in favor of university); *Gutzwiller v. Fenik,* 860 F.2d 1317, 1327 (6th Cir.1988) (two biased faculty votes sufficient to establish discriminatory employment decision in tenure process that required decisions at four separate levels). Shoucair presented a combination of factors that, taken as a whole, permitted the jury to conclude that the demise of Shoucair's tenure bid was a *fait accompli* once Glicksman's animus infected the process.

Brown contends that even if Glicksman did influence the process, Shoucair had the opportunity to make his case to subsequent reviewers and that in itself is enough to defeat his "rubber-stamp" argument. Shoucair admitted at trial that he had the chance to present written evidence to all reviewers and also to answer questions and speak on his own behalf at the division of engineering and ConFRaT meetings convened to consider his application for tenure.

Recently, the Supreme Judicial Court of Massachusetts cited several decisions from various courts in concluding that "[w]hen assessing the independence of the ultimate decision maker, courts place considerable emphasis on the decision maker's giving the employee the opportunity to address the allegations in question, and on the decision maker's awareness of the employee's view that the underlying recommendation is motivated by bias or a desire to retaliate." *Mole v. University of Massachusetts,* 442 Mass. 582, 814 N.E.2d 329, 344 (2004); *see Cariglia v. Hertz Equipment Rental Corp.,* 363 F.3d 77, 87 n. 4 (1st Cir.2004); *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1331–32 (11th Cir. 1999), *cert. denied,* 529 U.S. 1053, 120 S.Ct. 1555, 146 L.Ed.2d 460 (2000); *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 547–48 (7th Cir.1997). Although we agree with the Supreme Judicial Court that an employee's opportunity to be heard by subsequent reviewers is a strong indicator that an independent investigation has taken place, we are not prepared to say that as a matter of law by granting Shoucair a limited opportunity to be heard during subsequent stages of review Brown completely purged all traces of Glicksman's alleged retaliation. Although Shoucair did have the opportunity to be heard before the division of engineering and ConFRaT, he did not have any such opportunity to address the electrical sciences group before their vote—the vote that arguably sealed his fate. The jurors heard testimony that the decisions made at the group level are rarely, if ever, reversed at the divisional level, and that ConFRaT and the provost invariably adopt the recommendation of the division.

In light of the remarkable deference all subsequent reviewers apparently accorded to the group-level decision, we are unwilling to disturb the jury's finding that the tenure decision was ultimately a product of Glicksman's retaliatory animus toward Shoucair. We recognize that this is an exceedingly close question, and that a rational jury easily could reach a contrary verdict. Nevertheless, we are satisfied that the evidence led to more than one permissible result. Accordingly, we affirm the judgment in favor of Shoucair on his allegation of retaliation.

## III

## Damages

### A. Back Pay

The trial justice reduced by 30 percent the jury's back-pay award to Shoucair, reasoning that he bore some responsibility to mitigate his damages. In concert with federal courts in Title VII cases, we use an abuse-of-discretion standard when reviewing a trial court's decision to award or deny back pay damages under FEPA. *Carey v. Mt. Desert Island Hospital*, 156 F.3d 31, 40 (1st Cir.1998); *Selgas v. American Airlines, Inc.*, 104 F.3d 9, 12–13 (1st Cir.1997).

Professor Shoucair testified that he applied for numerous professorships after Brown denied him tenure, but was unable to find anything comparable. He did work briefly in the private sector, and he taught at UC–Berkeley for a couple of years, but only in an adjunct capacity. The trial justice did not rule that Shoucair was required to seek a position in the business sector immediately, but she did hold that "after discovering the unavailability of employment in academia, Shoucair was obligated to search for a position outside academia." The trial justice cited, among others, two decisions of the United States Court of Appeals for the First Circuit, to support her reduction of Shoucair's damages. In *Carey*, 156 F.3d at 40–41, and *Conetta v. National Hair Care Centers, Inc.*, 236 F.3d 67, 77 (1st Cir. 2001), the plaintiffs who failed to sustain reasonably diligent efforts to find suitable new employment saw their back-pay damages reduced as a result. Shoucair began his job search with much vigor, but as rejections from numerous colleges and universities began to pile up, his pursuit of employment fell off precipitously. Brown offered the testimony of an experienced recruiting consultant knowledgeable in the engineering job market, who averred that an "abundance of opportunities" existed in the industry for someone with Shoucair's training and expertise. Based on Shoucair's own admission that he abandoned his "systematic search" for academic positions after three years and credible evidence that ample opportunities existed outside academia, we detect no abuse of discretion in the trial justice's decision to reduce Shoucair's back-pay award by 30 percent.

### B. Compensatory Damages

FEPA provides for an award of compensatory damages, explaining that a plaintiff "shall not be required to prove that he or she has suffered physical harm or physical manifestation of injury in order to be awarded compensatory damages." Section 28–5–24(b). Here, Shoucair testified that he suffers from a variety of physical and emotional ailments, including "debilitating back problems," erratic sleeping and anxiety. He presented no expert medical testimony, however, establishing a causal connection between his self-professed physical and psychic injuries and the denial of his bid for tenure—an omission, Brown avers, that is fatal to his claim for compensatory damages.

In affirming the jury's award of $175,000 in compensatory damages, the trial justice again referred to Title VII jurisprudence. *See Merriweather v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576, 580 (7th Cir.1996) ("A plaintiff's testimony about emotional distress may, in certain instances, of itself suffice to support an award for nonpecuniary loss."); *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215 (6th Cir.1996) ("It is well settled that Title VII plaintiffs can prove emotional injury by testimony without medical support.").

As Brown points out on appeal, this Court steadfastly has required that a

plaintiff seeking recovery in a claim for tortious infliction of emotional distress must establish a causal relationship between his or her physical and psychic injuries and the defendant's misconduct by expert medical testimony. *See, e.g., Wright v. Zielinski,* 824 A.2d 494, 499 (R.I.2003); *Vallinoto v. DiSandro,* 688 A.2d 830, 838–39 (R.I.1997); *Reilly v. United States,* 547 A.2d 894, 896–99 (R.I. 1988). A lack of such testimony is not an absolute bar to recovery in all circumstances, however. In *Adams v. Uno Restaurants, Inc.,* 794 A.2d 489 (R.I.2002), which involved a claim brought against an employer under the Whistleblowers' Protection Act, G.L. 1956 chapter 50 of title 28, we determined that "[o]n the particular case facts before us, we do not find the absence of expert medical testimony to support the plaintiff's claim for damages resulting from his alleged emotional distress and humiliation to be fatal to that portion of his claim for damages." *Adams,* 794 A.2d at 493. Those particular case facts involved a "whistle-blower" who lost his military security clearance and was barred from accompanying his National Guard unit to Germany because he was arrested for disorderly conduct after he engaged in a heated argument with his manager at the restaurant where he worked. *Id.* at 492–93. This Court upheld the jury's award of damages for the plaintiff's resulting economic loss and emotional distress despite his failure to present expert medical testimony on causation. *Id.* at 494. We reasoned that after hearing all the evidence, "an ordinary lay person or trial juror would be capable of determining without the aid of expert medical testimony whether emotional distress and humiliation could ordinarily and naturally follow from such events." *Id.* at 493.

In the instant case, the jury determined that an intentional act of discrimina-

tory retaliation effectively ended Shoucair's career at Brown. We are satisfied that in the context of this case the jury did not need expert medical testimony to ascertain whether the resulting emotional distress Shoucair described to them was a natural consequence of such a devastating personal and professional blow. We discern, therefore, neither error of law nor abuse of discretion in the trial justice's refusal to set aside the award of compensatory damages.

## C. Punitive Damages

Section 28–5–29.1 provides the statutory authority for punitive damages under FEPA "where the challenged conduct is shown to be motivated by malice or ill will or when the action involves reckless or callous indifference to the statutorily protected rights of others * * *." Looking to *Kolstad v. American Dental Association,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) for guidance, the trial justice concluded that "a reasonable jury could have found that Glicksman acted with malice or with reckless indifference to Shoucair's protected rights" and that thus there was an evidentiary basis upon which the jury could award punitive damages. She did not, however, extend her analysis beyond Glicksman's conduct. Although we accept her conclusion that Glicksman's conduct may have met the standard of malice or reckless indifference, we respectfully disagree with her ultimate determination that Brown is liable for punitive damages.

As *Kolstad,* 527 U.S. at 540, 119 S.Ct. 2118 informs, "common law limitations on a principal's liability in punitive awards for the acts of its agents apply in the Title VII context." In the context of a FEPA claim, it is significant that "[t]his Court has repeatedly declared that punitive damages are severely restricted under

Rhode Island law." *Mark v. Congregation Mishkon Tefiloh,* 745 A.2d 777, 779 (R.I. 2000). "An award of punitive damages is considered an extraordinary sanction and is disfavored in the law, but it will be permitted if awarded with great caution and within narrow limits." *Palmisano v. Toth,* 624 A.2d 314, 318 (R.I.1993). Moreover, Rhode Island law does not countenance vicarious liability for punitive damages on a *respondeat-superior* theory. *Id.* at 321. "It has long been the law in this state that punitive or exemplary damages will not be allowed in situations in which a 'principal is prosecuted for the tortious act of his servant, unless there is proof in the cause to implicate the principal and make him *particeps criminis* of his agent's act.' " *AAA Pool Service & Supply, Inc. v. Aetna Casualty and Surety Co.,* 479 A.2d 112, 116 (R.I.1984) (quoting *Hagan v. Providence and Worcester R.R. Co.,* 3 R.I. 88, 91 (1854)). In Rhode Island, unless an employer participated in, authorized, or ratified the noisome act of its employee, punitive damages cannot properly be awarded against that employer. *Id.; see also Reccko v. Criss Cadillac Co.,* 610 A.2d 542, 545 (R.I.1992).

In *Kolstad,* 527 U.S. at 542, 119 S.Ct. 2118, the United States Supreme Court employed "the general common law of agency," as codified in the Restatement (Second) of *Agency* (1957), in laying out the factors that must be considered before one may impute liability for punitive damages to an employer for the actions of an employee:

> "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:
>
> "(a) the principal authorized the doing and the manner of the act, or

> "(b) the agent was unfit and the principal was reckless in employing him, or
>
> "(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> "(d) the principal or a managerial agent of the principal ratified or approved the act." *Kolstad,* 527 U.S. at 542–43, 119 S.Ct. 2118 (quoting Restatement (Second) of *Agency* § 217C).

Based on *Kolstad,* Shoucair contends that this Court should affirm his punitive damages on one or both of two theories. First, Shoucair asserts that Glicksman was employed in a managerial capacity and that he retaliated against Shoucair in the scope of that employment. Second, Shoucair contends that Brown ratified Glicksman's retaliatory act. But, as *Kolstad* acknowledges, the Restatement "provides a useful starting point for defining this general common law." *Id.* at 542, 119 S.Ct. 2118. Consequently, the bright lines apparently provided in *Kolstad* necessarily must pass through the prism of Rhode Island's own common-law tradition, and in this instance some refraction results.

As Justice O'Connor observed in *Kolstad,* "[u]nfortunately, no good definition of what constitutes a 'managerial capacity' has been found[.]" *Kolstad,* 527 U.S. at 543, 119 S.Ct. 2118 (quoting 2 Ghiardi, *Punitive Damages,* § 24.05, at 14 (1998)). Nor did the trial justice in this case address the issue of "managerial capacity" in her decision. Regardless, the common law of Rhode Island relieves this Court from attempting to quantify how that elusive label may or may not apply to Professor Glicksman because the evidence here did not implicate anyone other than Glicksman as a participant in his wrongful act, and, it is clear to us that Brown neither expressly nor implicitly authorized or ratified that

act.[7] *See Reccko,* 610 A.2d at 545; *AAA Pool Service,* 479 A.2d at 116.

Professor Shoucair argues that Brown knew of his complaint about the so-called "sham interview" and that its failure to investigate his allegations served to ratify Glicksman's alleged conduct. In making this argument, Shoucair acknowledges that he did not actually raise his concern over Glicksman's conduct until he testified before the FEC committee that was, in fact, *investigating* his grievance. Professor Shoucair does not explain why he failed to raise this issue earlier, when he had the opportunity to address the division of engineering before its vote, or when he spoke to ConFRaT before its vote. Other than his portentous reminders that Glicksman occasionally played bridge with Provost Rothman, among others, Shoucair offers nothing to suggest that Rothman knew anything about Glicksman's alleged retaliation when he ultimately denied Shoucair tenure. Moreover, Shoucair faults Brown because Professor McIllwain, who chaired the aforementioned FEC ad hoc committee, did not find the accusations against Glicksman to be "germane." Yet Shoucair's own formal written grievance to the FEC did not include any mention of Glicksman's retaliatory animus among its allegations. As such, it is hardly surprising that the report the ad hoc committee delivered to Brown's president after exten-

sive hearings and investigation did not mention it.

■ Under *Kolstad,* "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad,* 527 U.S. at 536, 119 S.Ct. 2118. In the course of conducting a thorough investigation into the matter, the ad hoc hearing committee, a group composed of Shoucair's peers from outside the division of engineering, concluded that his eleventh-hour allegation against Glicksman had no relevance in Brown's decision to deny Shoucair tenure. Given the ample opportunities Brown provided Shoucair to make his case and Shoucair's failure to demonstrate that either the provost or the president had any knowledge of the allegation upon which the jury based his award of punitive damages, we do not believe that Brown as an entity discriminated against Shoucair in the face of a perceived risk that its actions were illegal under FEPA.

We are satisfied that the evidence was insufficient to impute liability for punitive damages against Brown and that the trial justice erred in holding Brown liable for such damages. Accordingly, we vacate the award of punitive damages.

### D. Reinstatement and Front Pay

■ Finally, we affirm the trial justice's denial of Shoucair's motions for reinstatement or, in the alternative, for front

---

7. We note that, common law aside, the *Kolstad* opinion states unequivocally that an employer is *not* liable for the discriminatory act of a management-level employee if that act is contrary to the employer's good-faith efforts to comply with anti-discrimination laws. *Kolstad v. American Dental Association,* 527 U.S. 526, 545, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Of course, common law may not be cast aside here, and neither party has raised this particular aspect of *Kolstad,* but it bears mentioning that the sheer number of peers and administrators that reviewed Shou-

cair's tenure dossier and heard his eventual appeal indicates a comprehensive and overarching effort on Brown's part to guard against any discrimination in the tenure review process. That Glicksman's especially subtle form of retaliation evaded the many watchful eyes that Brown put in place to detect any discrimination is more a testament to the elusive nature of this particular episode of ivory tower intrigue than it is an indictment of Brown's good-faith efforts to comply with FEPA.

pay. We find no abuse of discretion in the trial justice's determination that "Shoucair is not now qualified for a position at Brown because he has not had any significant experience in the constantly evolving field of engineering for almost ten years." Professor Shoucair argues that if he is unqualified at present, it is because Brown's unwarranted denial of his tenure has so damaged his reputation that he has been unable to find a suitable position anywhere in the field of engineering. But Shoucair's own testimony reveals that he cannot recall if he even has applied for a position of any sort since 1997. The trial justice predicated her refusal to order Shoucair's reinstatement at Brown on his failure to keep current in his field. We agree with the trial justice that *Kamberos v. GTE Automatic Electric, Inc.*, 603 F.2d 598, 603 (7th Cir.1979), in which the court opined that reinstatement "is not appropriate unless the person discriminated against is presently qualified to assume the position sought," is analogous and applicable to Shoucair's situation. In *Kamberos*, the plaintiff sought a position as a corporate attorney, but the court found that the plaintiff failed to demonstrate that she had acquired any significant corporate law experience in the nineteen years after she was wrongfully passed over for a job. *Id.* Noting that "[t]he field of corporate law is not static and [had] changed significantly" in the intervening years, the court refused to issue a hiring order as part of the plaintiff's remedy. *Id.* The science of engineering undoubtedly has advanced in numerous ways while Shoucair has been out of the loop; accordingly, we hold that the trial justice exercised sound discretion in declining to order his reinstatement at Brown.

■ Similarly, we endorse the trial justice's ruling that front pay is not appropriate in Shoucair's case. We agree with her reference to *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 380 (1st Cir. 2004), in which the court explained: "[a]wards of front pay * * * are generally entrusted to the [trial judge's] discretion and are available in a more limited set of circumstances than back pay." This Court treats with great deference the trial justice's finding that Shoucair failed to expend sufficient effort to mitigate his damages. In his appeal for front pay, Shoucair relies on the same arguments we rejected in affirming the reduction of his back-pay award, *i.e.*, that the black mark placed indelibly on Shoucair's résumé by his failure to gain tenure effectively ended his chances at ever attaining another university professorship, and that he was not required to seek work outside academia to mitigate his damages. We are satisfied, however, that the trial justice did not abuse her discretion in denying Shoucair's request for the equitable remedy of front pay in light of the remedial relief he had otherwise been awarded. Accordingly, we affirm the trial justice's denial of Shoucair's motion for front pay.

### Conclusion

Based on the foregoing analysis, we vacate the judgment insofar as it awards punitive damages to Professor Shoucair and we remand the case to the Superior Court with instructions to strike the punitive damages from Professor Shoucair's award. We affirm the judgment in all other respects.