# United States Court of Appeals
## For the First Circuit

No. 11-1686

ALEX ALVARADO,

Plaintiff, Appellant,

v.

PATRICK R. DONAHOE, in his official capacity
as Postmaster General, United States Postal Service,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

José F. Quetglas-Jordán and Pedro R. Vázquez, III, on brief
for appellant.
David C. Belt, Attorney, Office of General Counsel, United
States Postal Service, Rosa E. Rodríguez-Vélez, United States
Attorney, Nelson José Pérez-Sosa, Assistant United States Attorney,
and Michael J. Elston, Chief Counsel, Appellate & Commercial
Litigation, on brief for appellee.

July 19, 2012

**TORRUELLA, Circuit Judge.** Plaintiff-Appellant Alex Alvarado ("Alvarado") appeals from the district court's grant of summary judgment on his claim of retaliation against his employer, the United States Postal Service ("USPS"). On appeal, Alvarado alleges that the summary judgment record contains sufficient evidence to establish a claim of unlawful retaliation under the Rehabilitation Act, 29 U.S.C. § 791 et seq. Because we conclude that Alvarado has not proffered evidence sufficient to establish a prima facie claim of retaliation, we affirm the district court's decision.

## I. Background

### A. Alvarado's Employment with USPS

Alvarado began his career at the USPS in 1991. In 2000, he became a full-time mail carrier and was assigned to a delivery route in the Bayamón, Puerto Rico area.

Alvarado has a documented medical history of recurrent schizoaffective disorder which was first diagnosed in August 1992. He began taking medication for this disorder at age fifteen. According to Alvarado, the medication made him drowsy and slowed his work pace, at times making him late with his mail delivery. Any negative side effects, however, apparently paled in comparison to the medication's benefits: Alvarado was largely able to control the symptoms of his condition and effectively perform his duties during most of his tenure as a mail carrier. Testament to his

-2-

competent performance is the fact that Alvarado received varied commendations from his superiors throughout his employ.

Alvarado claims to have been subjected to harassment and discrimination from the moment he told his superiors of his medical condition.[1]  In a notable November 2006 incident that set the wheels of this action in motion, Carmelo Moyeno ("Moyeno"), the President of the Union of Mail Carriers, made allegedly derogatory remarks to Alvarado about his mental health such as "[t]ake your pills" and "[y]ou really don't know about real problems," which Alvarado felt were intended to belittle his condition.  On January 23, 2007, in response to those comments, Alvarado requested an appointment with a dispute resolution specialist with the USPS's Equal Employment Opportunity ("EEO") office.  He followed his appointment by filing EEO charges on February 8, 2007, which alleged that two of his supervisors, Rubén Maldonado ("Maldonado") and Eddie Labrador ("Labrador"), failed to prevent Moyeno's verbal abuse.

On April 19, 2007, Alvarado notified Maldonado and Labrador about his EEO filing.  That same day, while Alvarado sang within Moyeno's earshot, Moyeno said in front of their co-workers: "[g]ive him the pill.  He has not taken his pill.  He needs his

---

[1]  The record is unclear regarding when Alvarado delivered the news about his psychiatric diagnosis and treatment to his supervisors at the Bayamón USPS branch.  It appears to have taken place at some point between April 2006 and January 2007.

green, yellow, red pill. Which pill hasn't he taken?" Moyeno made similar derisive comments regarding Alvarado's condition and medication throughout 2007 and 2008.[2]

At another unspecified date in 2007, Alvarado brought "sorullos"[3] ("corn sticks") to work as a gift for his co-workers. Maldonado told Alvarado that he would "put [him] to work with [his] family." Because Alvarado's family worked in a factory making corn sticks, Alvarado interpreted this comment as a threat that Maldonado would terminate his employment. Also in 2007, after Alvarado presented another of his supervisors, Armando Pérez ("Pérez"), with administrative Family and Medical Leave Act ("FMLA") documents related to his condition and treatment, Pérez repeatedly called Alvarado "crazy." Alvarado testified that Pérez frequently made similar comments throughout 2008 but did not provide detail regarding other specific incidents.

During the same time period, another supervisor, Delivery Programs Manager Andrew Zeisky ("Zeisky"), searched Alvarado's car

_____

[2]   The record contains an EEO investigative affidavit in which Orlando González, one of Alvarado's co-workers, corroborated that the April 19, 2007 incident involving Moyeno took place. González also stated that Moyeno made similar statements "around years 2007 to 2008." We take these and all other facts in the record below as true and "resolv[e] any factual conflicts or disparities" in Alvarado's favor. Colt Def. LLC v. Bushmaster Firearms, Inc., 486 F.3d 701, 705 (1st Cir. 2007).

[3]   "Sorullos," also known as "sorullitos," are a typical Puerto Rican dish prepared by frying cornmeal-based batter that has been rolled into "stick" form. The parties here refer to sorullos as "corn sticks." We adopt their nomenclature for ease of reading.

-4-

on multiple occasions. Alvarado conceded that, as a USPS manager, Zeisky was authorized by regulation to search all privately owned vehicles that mail carriers used to deliver mail, but nevertheless felt that Zeisky selectively targeted him for searches and that, in any case, Zeisky's searches were unjustly and excessively thorough.

In time, Alvarado ran into problems relating to his work performance. Alvarado's slow work pace, which he claimed to be a side effect of his medication, became a growing concern of his supervisors starting in late 2007. During that year's Christmas season -- a period marked by an increase in mail deliveries -- Alvarado frequently returned from his delivery route after 5:00 PM, the branch's official closing time. Maldonado instructed Alvarado that if he arrived after 5:30 PM, he should leave any undistributed mail, keys, and other equipment in a storage room outside the post office. Instead of providing a solution for his lateness, Alvarado testified that Maldonado's instructions caused him more anxiety and fear, as he felt that, were any mail to be stolen, he would be held responsible and likely fired.

Matters came to a head in early 2008. On January 26, 2008, Customer Service Supervisor Brenda Ríos ("Ríos"), another of Alvarado's supervisors, discovered a container full of undelivered mail, for which she believed Alvarado was responsible. On January 30, 2008, Alvarado was unable to return to the post office from his delivery route by 5:00 PM as required by standard

procedure and did not communicate with Ríos to inform her of his whereabouts, instead calling a co-worker.[4]  Expecting Alvarado and unaware of his location, Ríos called Alvarado's cell phone and, when Alvarado did not answer, left a message in which she threatened to contact the postal inspectors if he did not promptly return.  Alvarado eventually arrived at the USPS branch at approximately 6:30 PM -- an hour and a half past his scheduled arrival time -- but was not disciplined for his tardiness.  Upset at Ríos's threats to call the postal inspectors, however, Alvarado contacted the EEO office that same day and filed a preliminary complaint report alleging harassment and managerial misconduct on Ríos's part.  Approximately a week later, on February 6, 2008, Zeisky issued Alvarado a fourteen-day suspension for improper conduct and delay of mail relating to the January 26, 2008 incident involving the undelivered mail.  Zeisky based his decision to suspend Alvarado on Ríos's explanation of the event and on information that he received from Customer Supervisor Awilda Rodríguez ("Rodríguez"), another of Alvarado's supervisors at the Bayamón station.[5]

---

[4]  It is not clear whether USPS regulations required Alvarado to telephone his supervisor, and he was not disciplined for the incident.  Alvarado claims to have called the co-worker who was supposed to be waiting for the remaining undelivered mail, keys, and equipment.

[5]  Following his resignation, on May 15, 2008, Alvarado received notice from the National Letter Carrier Association that his suspension had been reduced to a letter of warning, the lowest

On February 16, 2008, Alvarado returned to the Bayamón USPS branch at approximately 6:00 PM after completing his delivery route and found it closed. In his deposition, Alvarado testified that the situation reminded him of the January 30, 2008 incident, and, feeling anxious and humiliated, he began to cry. Alvarado did not return to work after that date and officially resigned his post on April 29, 2008. Since his resignation, Alvarado has been found permanently disabled and eligible for disability benefits by the Social Security Administration and the Department of Labor Office of Workmen's Compensation Program.

## B. Procedural History

On April 15, 2008, Alvarado filed a formal EEO complaint of discrimination against Moyeno, Ríos, Rodríguez, Pérez, and Maldonado. In his complaint, Alvarado claimed that he had been subjected to a hostile work environment during a period spanning April 2007 through February 2008 and that this unfortunate turn of

---

applicable level of disciplinary action. <u>Alvarado</u> v. <u>Potter</u>, 813 F. Supp. 2d 247, 251 (D.P.R. 2011).

Both Zeisky and Rodríguez endorsed Alvarado's February 6, 2008 Notice of Suspension. Alvarado named Rodríguez as a "person who took discriminatory actions against him" in his formal EEO complaint for disability-based discrimination and retaliation against USPS. The extent, if any, to which Rodríguez was involved in the January 26, 2008 incident -- with the exception of providing information to Zeisky, her supervisor, and endorsing the agency's decision to suspend Alvarado in her supervisory capacity -- is unclear.

events was brought on in retaliation for his decision to file charges with the EEO office in February 2007.

Alvarado exhausted EEO administrative proceedings and, in August 2008, filed suit in the U.S. District Court for the District of Puerto Rico against the Postmaster General, alleging discrimination on the basis of disability and unlawful retaliation under the Rehabilitation Act, 29 U.S.C. § 791 et seq.

On May 4, 2011, the district court granted the Postmaster General's request for summary judgment. See Alvarado v. Potter, 813 F. Supp. 2d 247 (D.P.R. 2011). As to Alvarado's allegations of disability discrimination, the district court reasoned that Alvarado could not establish a prima facie claim under the Rehabilitation Act because he could not show that he was "substantially limited" in any of the major life activities allegedly impaired by his disorder. Id. at 254. The district court also found that Alvarado could not make out a prima facie claim of unlawful retaliation because the harassment that Alvarado alleged to have suffered did not constitute an "actionable 'hostile work environment' claim." Id. at 256. Alvarado then appealed.

## II. Discussion

### A. Standard of Review

We review the district court's grant of summary judgment de novo. See Pérez-Cordero v. Wal-Mart P.R. Inc., 656 F.3d 19, 25 (1st Cir. 2011). Summary judgment is reserved for circumstances where the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (citing Fed. R. Civ. P. 56(a)). In retaliation cases, where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests only upon conclusory allegations, improbable inferences, and unsupported speculation. Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855-56 (1st Cir. 2008); see also Vives v. Fajardo, 472 F.3d 19, 21 (1st Cir. 2007).

### B. Allegations of Retaliation

As noted, Alvarado's district court claim alleged discrimination on the basis of his disability and retaliatory harassment leading to constructive discharge. The district court granted summary judgment against Alvarado as to both claims, but Alvarado now asserts an appeal only with regards to his claim of retaliatory harassment. We limit our discussion accordingly.

We review Alvarado's claim of unlawful retaliation under the customary McDonnell Douglas burden-shifting framework. See

<u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792, 802-04 (1973). In order to establish a prima facie claim of retaliation, Alvarado must demonstrate that (i) he undertook some protected conduct, (ii) he suffered an adverse employment action, and (iii) that the two were causally linked. <u>Carmona-Rivera</u> v. <u>Puerto Rico</u>, 464 F.3d 14, 19 (1st Cir. 2006) (citing <u>Noviello</u> v. <u>City of Boston</u>, 398 F.3d 76, 88 (1st Cir. 2005)). If Alvarado establishes a prima facie claim, the burden then shifts to his employer to proffer a "'legitimate, non-retaliatory reason for [its] employment decisions.'" <u>Roman</u> v. <u>Potter</u>, 604 F.3d 34, 39 (1st Cir. 2010) (quoting <u>Enica</u> v. <u>Principi</u>, 544 F.3d 328, 343 (1st Cir. 2008)) (alterations omitted). If the employer provides a legitimate reason and meets this burden of production, Alvarado -- who retains the burden of proof throughout -- would have to show that his employer's stated reasons are pretextual and proffered to disguise retaliatory animus. <u>See</u> <u>Collazo</u> v. <u>Bristol-Myers Squibb Mfg.</u>, 617 F.3d 39, 46 (1st Cir. 2010).

The parties do not dispute that Alvarado engaged in protected conduct when he filed an EEO claim on February 8, 2007. As to the second prima facie factor, Alvarado claims that he was subjected to a sequence of taunts, derogatory comments, and increased or unjustified supervision and discipline, all of which came on the heels of his protected activity. Considered in the aggregate, these events, Alvarado claims, compounded to create a

-10-

hostile work environment that left him no option but to leave his employment. We assess the merits of Alvarado's claims.

### 1. Alleged Retaliatory Incidents that May Not Properly be Included in the Hostile Work Environment Calculus

That a series of minor retaliatory actions may, when considered in the aggregate, satisfy the McDonnell Douglas prima facie "adverse action" requirement, is settled law in this Circuit. See, e.g., Noviello, 398 F.3d at 91 (holding that "subjecting an employee to a hostile work environment in retaliation for protected activity constitutes an adverse employment action"); see also Billings v. Town of Grafton, 515 F.3d 39, 54 n.13 (1st Cir. 2008). But, as the third prima facie factor commands, it is similarly accepted that alleged retaliatory actions against an employee must bear a causal connection to some protected conduct in order to establish a prima facie claim that rests on a hostile work environment theory. Consequently, "[i]t is only those actions, directed at a complainant, that stem from a retaliatory animus which may be factored into the hostile work environment calculus." Noviello, 398 F.3d at 93.

A number of the acts that Alvarado claims converged to create a hostile work environment plainly lack a causal connection from which a reasonable factfinder could discern retaliatory animus. Most notably, the record contains compelling evidence in the form of affidavits which suggest that several of the supervisors whom Alvarado claims carried out retaliatory acts

-11-

against him did not, in fact, know that Alvarado had filed EEO charges against his employer at the time that events involving them took place. Speaking commonsensically, our cases have in the past explained that, to successfully establish a claim of unlawful retaliation there must be, "at a minimum, . . . competent evidence that the alleged retaliators knew of the plaintiff's protected activity and that a retaliatory motive played a part in the adverse employment actions alleged . . . ." Lewis v. Gillette Co., 22 F.3d 22, 24 (1st Cir. 1994) (emphasis added); see also Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 85 (1st Cir. 2006). The reasons underlying such a requirement are obvious: if a supervisor or other employee is unaware of the fact that a plaintiff engaged in protected conduct, any actions attributable to him could not plausibly have been induced by retaliatory motives. See Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997, 1008 (7th Cir. 2000) ("An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.").

As suggested, Alvarado attributes several claims of retaliation to individuals who seemingly had no knowledge of his protected activity. First, Alvarado alleges that Colón, a supervisor, subjected him to "extreme supervision and mockery" starting at some point in April 2007. Specifically, Alvarado

claims that after instances in which he returned late from delivering the mail, Colón would threaten to sic postal inspectors upon him to follow him throughout his route and, importantly, that Colón would do this in retaliation for his February 2007 EEO filings.[6]  Without delving into the question of whether Colón's comments were a proper response to Alvarado's tardiness, we note that in an EEO investigative affidavit dated July 2, 2008, Colón affirmed that he was not "aware of [Alvarado's] prior EEO activity" -- a fact that would render any activity attributable to Colón ineffectual to the retaliatory calculus.[7]  This denial of knowledge is not refuted by any evidence in the summary judgment record.

The Postmaster General correctly notes that the same can be said of other supervisors whom Alvarado claims acted out of retaliatory animus against him.  Zeisky, for example, who allegedly

---

[6]  There is no indication in the record that Colón ever followed through on his threats to call the postal inspectors to have them follow Alvarado along his route.  Nor is there indication that Colón took any other action regarding Alvarado's tardiness.

[7]  The record shows that Colón was aware of Alvarado's condition because, at least on one occasion, Colón endorsed FMLA materials related to Alvarado's psychiatric treatment.  We note that the fact that Colón may have had knowledge of Alvarado's disability does not bear on the separate question of whether Colón retaliated against Alvarado for engaging in protected activity.

Insofar as Alvarado claims that Colón's retaliatory conduct was of a prolonged nature, we further note that Alvarado does not dispute record evidence showing that, from July 2007 and through the remainder of the relevant period, Colón was assigned to work in USPS branches other than Alvarado's and did not directly oversee his work after that date.

searched Alvarado's car without justification at unspecified points in 2007 and 2008, also stated in an uncontradicted EEO affidavit that he was unaware of any EEO activity undertaken by Alvarado, and, thus, was oblivious to his having engaged in the established protected conduct. So also affirmed Ríos, the attending supervisor involved in the January 26, 2008 incident for which Alvarado was disciplined with a fourteen-day suspension, and Rodríguez, another of Alvarado's supervisors at the USPS Bayamón branch.

Alvarado does little to counter these supervisors' attestations that they were uninformed of his decision to file EEO charges. Insofar as he challenges this evidence, Alvarado states, without more, that supervisors other than Maldonado and Labrador -- whom Alvarado directly notified about his EEO charges -- "should have known" about his protected conduct by virtue of their managerial status, because "supervisors and 'Union' members [would] get in contact constantly [to] discuss[] employee's problems." Such an unsubstantiated statement, however, lacking support in the record or other proffered evidence, is not only flimsy but fatally so. At the summary judgment stage, Alvarado cannot rely on "bare allegations," he must, instead, "point to specific facts that were properly asserted in . . . affidavits and supporting materials" which would permit a reasonable juror to find in his favor at trial. Floyd v. Farrell, 765 F.2d 1, 5 (1st Cir. 1985) (quoting Over the Rd. Drivers, Inc. v. Transp. Ins. Co., 637 F.2d 816, 818

-14-

(1st Cir. 1980)) (internal quotation mark omitted); see also Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) ("Conclusions that rest wholly on speculation are insufficient to defeat a motion for summary judgment."). Having failed to do so in connection with his claims that supervisors Colón, Zeisky, Ríos, and Rodríguez were motivated by retaliatory animus in their interactions with him or their decisions to take disciplinary action against him, Alvarado may not properly rely on these incidents in pressing his overarching contention that a hostile work environment drove him to resign his post. See Noviello, 398 F.3d at 93.

**2. Remaining Allegations of Retaliation that Alvarado Alleges Compounded to Create a Hostile Work Environment**

For the reasons we have explained above we conclude that Alvarado may only rely on the incidents involving Moyeno, one of his co-workers, and Maldonado and Pérez, two of his supervisors, in his efforts to make out a prima facie claim of unlawful retaliation. Alvarado alleges -- and we credit his assertion as true -- that he informed Maldonado of his EEO discrimination complaint on April 19, 2007. Because the record does not contain evidence which would suggest that Moyeno and Pérez either knew or, conversely, were unaware of Alvarado's protected activity, we resolve any uncertainty in that regard in Alvarado's favor and assume for present purposes that they both knew of his having filed EEO charges against Maldonado and Labrador in February 2007.

-15-

In assessing whether Alvarado can make a prima facie showing that he suffered a materially adverse action, we ascertain whether, taken together, any actions attributable to these individuals "show that a reasonable employee would have found the [conduct] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Carmona-Rivera, 464 F.3d at 20 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)) (internal quotation mark omitted). Under the hostile work environment theory that Alvarado presses, even a string of trivial annoyances will not suffice to make an adverse action showing: "the alleged harassment must be 'severe or pervasive,'" Gómez-Pérez v. Potter, 452 F. App'x 3, 9 (1st Cir. 2011) (quoting Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 40 (1st Cir. 2003)) (internal quotation mark omitted). And any abuse must be both objectively offensive (as viewed from a reasonable person's perspective) and subjectively so (as perceived by the plaintiff). Noviello, 398 F.3d at 92. Consequently, our inquiry looks to separate the wheat from the chaff, to "distinguish between the ordinary . . . vicissitudes of the workplace and actual harassment." Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)); see also Colón-Fontánez v. Mun. of San Juan, 660 F.3d 17, 43 (1st Cir. 2011).

We do not believe that Alvarado has met his prima facie burden to establish that he suffered a materially adverse

employment action because the remaining examples of allegedly retaliatory conduct upon which he relies fall markedly short of what we have in the past considered suggestive of a hostile work environment. One of these incidents is so inadequate as to warrant individual mention. Specifically, Alvarado relies on the fact that at some point in late 2007 or early 2008 -- and, by Alvarado's own admission, following a string of instances in which he was late in returning from delivering mail along his route -- Maldonado instructed him that if he were to arrive after 5:30 PM, he was to leave any undelivered mail in a storage room outside the USPS branch, along with his keys and other USPS-issued equipment. Even viewing the facts in the light most favorable to Alvarado, however, we fail to see how Maldonado's comment could be construed as harassing in character, either standing alone or within the greater pattern of workplace hostility that Alvarado claims to have suffered. At best, Maldonado's comment appears to have been a supervisory command intended to accommodate Alvarado's admitted propensity to finish his workday later than policy dictated during the relevant time period. But even stripped of any goodwill on Maldonado's part, Maldonado's instructions to Alvarado that he should deposit undelivered mail, his keys, and other agency-provided equipment in a storage room outside the USPS branch seem neutral in nature instead of offensive or abusive -- by no means

the stuff from which objectively hostile work environments are made.[8]

The remaining episodes involving Maldonado, Moyeno, and Pérez are admittedly more troublesome and suggest that Alvarado's relationships with these three individuals were not without tension or discomfort. First, there is the April 19, 2007 incident in which Moyeno derisively told co-workers to "give [Alvarado] the pill" and loudly asked "[w]hich pill hasn't he taken," presumably mocking the fact that Alvarado audibly sang to himself while he worked at the time. Second, at an unspecified date in 2007 on which Alvarado brought corn sticks as a treat for his co-workers, Maldonado told Alvarado that he would "put [him] to work with [his] family," a statement that Alvarado claims to have understood as a threat to his continued employment. Finally, Alvarado alleges that, at another unspecified point in late 2007, Pérez repeatedly called him "crazy" after he showed Pérez an FMLA document which referenced his schizoaffective condition, specifically telling him: "crazy, crazy, you're crazy."

---

[8] In his filings to the EEO office, the district court, and this court, Alvarado has stated that Maldonado's instructions that he should leave any undelivered mail and equipment in a storage room caused him anxiety and fear. Alvarado attributes his consternation to the fact that he believed that if any undelivered mail or materials were stolen from the storage room or otherwise misplaced, he would be held responsible. We do not discount or minimize any anxiety or fear that Alvarado may have felt. However, while Maldonado's directions may have seemed, to Alvarado, subjectively disagreeable or even antagonistic, we do not find that they were objectively so.

-18-

It can hardly be doubted that most individuals would find these incidents unpleasant to forbear. Moyeno, Maldonado, and Pérez were all, at the time of these respective events, aware of Alvarado's psychiatric condition; their taunting and mocking comments were both callous and objectionable. But distasteful as their actions may have been, they do not constitute the severe or pervasive adverse conduct that the case law recognizes as "discriminatory changes in the 'terms and conditions of employment,'" Faragher, 524 U.S. at 788, sufficient to "establish an objectively hostile or abusive work environment," Colón-Fontánez, 660 F.3d at 44. See also Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins . . . to survive the slings and arrows that workers routinely encounter in a hard, cold world."). Moreover, Alvarado has not specified the dates on which the incidents involving Maldonado or Pérez took place, with the exception of indicating that the latter took place in late 2007. Therefore, his hostile work environment claim necessarily rests on three discrete verbal exchanges taking place over the course of a period spanning more than eight months. Conduct of the kind that Alvarado underscores simply does not rise to the level of pervasiveness or gravity which we have, in the past, considered indicative of a hostile or abusive work environment. See Noviello, 398 F.3d at 93-94 (finding retaliatory

-19-

hostile work environment where plaintiff "subjected to [] steady stream of abuse" over the course of several months, was falsely accused of misconduct, and was subjected to "'work sabotage, exclusion, and denial of support'" (quoting O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001) (alterations omitted))); Che, 342 F.3d at 40-41 (upholding jury's finding of hostile work environment where there was evidence that plaintiff "received undeserved or excessive discipline" consistently over two year period, "employees were permitted to scream at [plaintiff] without punishment," and there was evidence that supervisors used racially derogatory terms in referring to plaintiff). Nor, importantly, is it even comparable to conduct that we have previously deemed insufficient to sustain such a claim. See Colón-Fontánez, 660 F.3d at 44 (holding appellant could not show hostile or abusive work environment where supervisor regularly refused to meet with appellant, yelled at her in front of co-workers, failed to act to prevent or deter other employees from making derogatory comments regarding appellant, and limited appellant's movements around workplace, inter alia).

In sum, even viewing the summary judgment record in the light most favorable to Alvarado, we believe that the incidents of allegedly abusive conduct supporting his allegations of a retaliatory hostile work environment are analogous to the "episodic, but not frequent . . .; upsetting, but not severe;

mildly humiliating, but not physically threatening" slights that we have consistently considered inadequate. Id. at 44-45. We must accordingly conclude that Alvarado's claim fails as a matter of law.

### 3. Loose Ends and Remaining Claims

As the above-outlined points explain, we find that Alvarado's claim of unlawful retaliation founders at the prima facie threshold. We consider and address some points raised in Alvarado's briefing to dispense with any remaining unresolved issues.

#### a. Temporal Proximity Between Alvarado's January 2008 EEO Contact and February 2008 Suspension

In preparing for a battle he never gets to fight, Alvarado sets forth arguments going to the matter of causation. Here, Alvarado contends that a close temporal proximity between his protected conduct and the intensification of an alleged hostile work environment establishes a retaliatory nexus between the two. See Pérez-Cordero, 656 F.3d at 31 (noting "escalation of a supervisor's harassment on the heels of an employee's complaints about the supervisor is sufficiently adverse action to support a claim of employer retaliation").

We have already held that several of the incidents that Alvarado claimed combined to create a hostile work environment lacked such a causal connection because Alvarado did not proffer evidence that would allow a reasonable jury to find that Colón,

-21-

Zeisky, Ríos, or Rodríguez knew that Alvarado filed EEO charges in February 2007. Moreover, because the other incidents we have discussed were not sufficiently pervasive or severe to constitute a hostile work environment or materially adverse action when considered in the aggregate, it is irrelevant whether they took place in close temporal proximity to Alvarado's protected conduct.

Nonetheless, Alvarado introduces a wrinkle into his causation argumentation which we deem proper to address. Specifically, in his briefing to this court, Alvarado cursorily highlights the fact that he received a fourteen-day suspension just seven days after he communicated with the EEO office regarding the January 30, 2008 incident in which his late return to the USPS Bayamón branch prompted Ríos to call Alvarado and, when she did not reach him, to leave a voicemail message in which she threatened to call the postal inspectors if he did not promptly return. The implication here appears to be that, at a minimum, that particular employment decision -- i.e., the decision to suspend him on February 6, 2008 -- was made in retaliation for his decision to contact the EEO office and file preliminary charges against Ríos on January 30, 2008.

There is merit at the margins of Alvarado's postulation -- federal anti-retaliation provisions generally prohibit conduct taken in retaliation for any protected activity, not just a plaintiff's initial protected action. Cf. Jones v. Walgreen Co.,

-22-

679 F.3d 9, 21 n.8 (1st Cir. 2012). And, based on our prior cases, we can assume for present purposes that Alvarado's January 2008 communications with the EEO office constituted separate protected conduct. See, e.g., Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25-26 (1st Cir. 2004). Moreover, we can also assume that an interval of approximately one week between protected conduct and his suspension is sufficiently close temporal proximity to warrant a prima facie inference of a causal connection between the two. See id.

But, to the extent Alvarado here tries to develop an argument, he fails because he cannot overcome the defendant's asserted legitimate, non-retaliatory reason for his suspension. Specifically, Zeisky and Rodríguez, the supervisors involved in the decision to suspend Alvarado, attested that they did so in response to the January 26, 2008 incident in which Ríos, another supervisor, happened upon a "tub" of undelivered mail for which she believed Alvarado was responsible. As the Postmaster General correctly notes, this proffered legitimate reason for issuing Alvarado's fourteen-day suspension on February 6, 2008 is consistent with the text of the actual Notice of Suspension that Alvarado received, which explained that Alvarado was being disciplined for "improper conduct" and "delay of mail." The Notice further explained that Alvarado's actions were in violation of several provisions of the USPS's Employee and Labor Relations Manual, as well as various

-23-

federal statutes.  See, e.g., 18 U.S.C. § 1703 (making the unlawful destruction or delay of "any letter, postal card, package, bag, or mail" an offense punishable by fine or imprisonment of no more than five years).

As the Postmaster General has articulated a legitimate reason for the USPS's decision to suspend Alvarado, Alvarado bears the ultimate burden to show that this reason is "in fact a pretext and that the job action was the result of . . . retaliatory animus."  Calero-Cerezo, 355 F.3d at 26.  With the exception of underscoring that he received his suspension a week after filing EEO charges against Ríos, Alvarado does not present any arguments or evidence that would allow us to conclude that his employer's stated legitimate reason masked retaliatory motives.  Accordingly, Alvarado's reliance on any temporal proximity between his January 2008 EEO activity and his suspension is unavailing.  See Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (noting "chronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation'" (quoting Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997))).

### b. Other Incidents Regarding Colón

A separate incident involving Colón, we believe, also merits individual discussion.  Nestled in the allegations of hostility that Alvarado levels against Colón is Alvarado's claim

that at some unidentified point in 2007, he informed Colón of his plans to file an EEO complaint against him if Colón did not desist from his threats to report Alvarado to the postal inspectors. According to Alvarado, Colón responded by telling him that if he followed through on his comment and filed a complaint against him, Colón would then certainly contact the postal inspectors and ask them to "intervene with" Alvarado.

Colón features among the supervisors that attested, in EEO affidavits, that they were unaware Alvarado filed EEO charges against two of his supervisors, Maldonado and Labrador, in February 2007. Because Alvarado did not proffer evidence sufficient to raise a triable issue of fact as to whether Colón did, in fact, know of his February 2007 EEO charges, we have already concluded that Alvarado could not make a prima facie causal connection between his protected activity and Colón's threats to call the postal inspectors. But the incident we have just described could arguably stand alone. Assuming, for present purposes only, that Alvarado's act of informing Colón that he intended to file EEO charges against <u>Colón</u> constituted protected conduct within the <u>McDonnell Douglas</u> framework, then Colón's threat to ask the postal inspectors to "intervene with" Alvarado if these charges ever materialized, might plausibly seem to be, at least at first blush, the kind of action that "could well dissuade a reasonable worker

from making or supporting a charge of discrimination." <u>Burlington</u> <u>N.</u>, 548 U.S. at 57.

We need not, however, reach any further conclusions on this detour. Alvarado did not raise an independent claim related to this incident and has only described Colón's actions in relation to his theory that he was the victim of a targeted or abusive hostile work environment brought on in retaliation for protected actions that he took in February 2007 -- a claim we reject today. <u>See</u> <u>Taylor</u> v. <u>Am. Chem. Council</u>, 576 F.3d 16, 37 (1st Cir. 2009) (recognizing argument, but refusing to "reach it" indicating "it is enough to note that this argument was never made in the appellants' briefs").

### c. Constructive Discharge

Finally, we briefly address Alvarado's constructive discharge claim, which must also fail as a matter of law. To establish that he was constructively discharged, Alvarado would have to show that his "working conditions were 'so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign.'" <u>Roman</u>, 604 F.3d at 42 (quoting <u>Marrero</u> v. <u>Goya of P.R., Inc.</u>, 304 F.3d 7, 28 (1st Cir. 2002)). This is also an objective standard, and a plaintiff may not sustain such a claim by relying exclusively on subjective beliefs. <u>Marrero</u>, 304 F.3d at 28.

It is unnecessary to rehash the points we have already outlined above to find, as we do, that Alvarado's claim of constructive discharge also falls short of the mark. "To prove a retaliatory constructive discharge, [a plaintiff] must establish that his work environment was hostile." Hernández-Torres v. Intercont'l Trading, Inc., 158 F.3d 43, 48 (1st Cir. 1998). As we have already explained, Alvarado has not shown that his work conditions were so severe as to suggest an objectively hostile work environment. It necessarily follows that Alvarado has similarly failed to establish that a reasonable person in similar circumstances would have been compelled to resign his post.

### III. Conclusion

For the reasons explained above, we affirm the district court's grant of summary judgment.

**Affirmed.**